## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| MATTHEW R. KELLY, | ) | |
| | ) | |
| Plaintiff, | ) | No. 20-579C |
| | ) | |
| v. | ) | Filed: November 19, 2021 |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Matthew Kelly alleges that a decision by the Board for Correction of Naval Records ("BCNR" or "Board") denying his request for disability retirement was arbitrary and capricious, contrary to law, and/or unsupported by substantial evidence. Before the Court is Plaintiff's Motion for Judgment on the Administrative Record and Defendant's Cross-Motion for Judgment on the Administrative Record. For the foregoing reasons, the Court **DENIES** Plaintiff's Motion and **GRANTS** Defendant's Cross-Motion.

## I. BACKGROUND

### A. Statutory and Regulatory Framework for Disability Retirement

The Secretary of each branch of the armed services possesses the authority to retire a service member with retired pay if the Secretary determines the service member is "unfit to perform the duties of the member's office, grade, rank or rating because of physical disability incurred while entitled to basic pay." 10 U.S.C. § 1201(a).[1] To be eligible for disability retirement,

---

[1] Plaintiff correctly identifies 10 U.S.C. § 1201 as the money-mandating statute supporting the Court's jurisdiction in this matter. Pl.'s Compl. ¶ 4, ECF No. 1; *see Fisher v. United States*, 402 F.3d 1167, 1175 (Fed. Cir. 2005) (citing *Sawyer v. United States*, 930 F.2d 1577, 1580 (Fed. Cir. 1991)).

the service member's disability must be of a permanent nature and not the product of the member's own misconduct or neglect. *Id.* §§ 1201(b)(1), (b)(2). Additionally, disability retirement is available only to members who have either 20 years of service or whose disability is at least 30 percent under the Department of Veterans Affairs ("VA") Schedule for Ratings Disabilities and was incurred in, among other circumstances, the line of duty. *Id.* § 1201(b)(3). Congress has authorized the Secretary concerned to prescribe regulations implementing the statutory provisions governing retirement or separation due to physical disability. *Id.* § 1216(a).

The relevant regulation in Plaintiff's case is Secretary of the Navy Instruction ("SECNAVINST") 1850.4E, which defined the applicable standards and procedures used by the Navy to adjudicate disability cases at the time of Plaintiff's separation. Pursuant to the instruction, a Physical Evaluation Board ("PEB") acts on behalf of the Secretary of the Navy to determine a member's fitness to continue naval service and entitlement to disability benefits. *See* Department of Navy (DON) Disability Evaluation Manual, SECNAVINST 1850.4E, encl. (1), ¶ 1004.a (Apr. 30, 2002) (describing PEB procedures as part of the Navy's Disability Evaluation System ("DES")). In assessing whether a service member is eligible for disability retirement, SECNAVINST 1850.4E provides that:

> The sole standard to be used in making determinations of physical disability as a basis for retirement or separation is unfitness to perform the duties of office, grade, rank or rating because of disease or injury incurred or aggravated while entitled to basic pay. Each case is considered by relating the nature and degree of physical disability of the member to requirements and duties that member may reasonably be expected to perform in his or her office, grade, rank or rating.

*Id.*, encl. (3), ¶ 3301.[2]

---

[2] The instruction similarly defines unfitness as an inability to "reasonably perform the duties of office, grade, rank or rating." SECNAVINST 1850.4E, encl. (2), ¶ 2085.

The instruction provides four considerations for the PEB to assess in determining whether a service member can reasonably perform his or her duties: (1) common military tasks, *i.e.*, whether the member is unable to reasonably perform routine assignments expected of his or her office, grade, rank or rating; (2) physical readiness/fitness tests, *i.e.*, whether the member's condition prohibits him or her from taking all or part of physical readiness/fitness tests; (3) deployability, *i.e.*, whether the member's condition prevents him or her from being positioned outside the continental United States for an unspecified amount of time; and (4) special qualifications, *i.e.*, whether the member's condition causes the loss of any specialized qualifications. *Id.* ¶ 3304. Notably, the standards utilized for a disability determination and for considering common military tasks are effectively interchangeable: both assess whether the member can reasonably perform the duties of his or her office, grade, rank, or rating. *See id.* ¶¶ 3301, 3302.a, 3304.a.(1). Therefore, a finding that a service member cannot perform his or her common military tasks is dispositive to the ultimate question of the member's unfitness. By contrast, the considerations of deployability, physical fitness test, and special qualifications cannot be used individually as the sole basis for a finding of unfitness. *See id.* ¶ 3307.

In addition to the four considerations, the instruction also provides that the PEB may evaluate other general criteria when determining a member's unfitness, including, as relevant here, whether a member's condition poses a medical risk to the member (or other members) were the member to be retained on active duty and whether the condition imposes unreasonable requirements on the military to maintain or protect the member. *Id.* ¶¶ 3302.b.(1), (2).

"[I]n assessing service member fitness, including the circumstances of referral [to the DES]," SECNAVINST 1850.4E instructs the PEB to "[c]onsider all relevant evidence," *id.* ¶ 3303, and make a finding of fitness or unfitness based on a preponderance of the evidence, *id.* ¶ 3306.b.

The instruction recognizes that in certain circumstances performance evaluations "may provide better evidence than a clinical estimate by a physician of the service member's ability to perform his or her duties." *Id.* ¶ 3303.b; *see id.* ¶ 3205.  It also provides that a member can be determined fit based on a finding that he or she adequately performed duties until the time of referral for DES processing, even if medical evidence calls into question his or her physical ability to continue to perform those duties. *Id.* ¶ 3303.c.

Notably, SECNAVINST 1850.4E does not apply to a member who is pending administrative discharge for misconduct. *See id.*, encl. (1), ¶ 1002.b.  According to the instruction, "processing for administrative discharge for misconduct takes precedence over processing for disability." *Id.*

Although Plaintiff was never referred to the PEB for evaluation before the Navy discharged him, the standard and related considerations established in SECNAVINST 1850.4E, as discussed above, guide the Court in evaluating the propriety of the BCNR's decision-making process. *See Sawyer v. United States*, 930 F.2d 1577, 1581 (Fed. Cir. 1991) (recognizing the BCNR "is competent to make a disability determination in the first instance"); *Beckham v. United States*, 392 F.2d 619, 622 (Ct. Cl. 1968) (recognizing the BCNR, "like other administrative bodies, is bound by its own regulations").

## B.    Findings of Fact

Plaintiff enlisted in the United States Navy and entered active duty on November 12, 2008. Admin. R. 146, 153, ECF No. 8 ("AR").  Within a year of enlisting, Plaintiff graduated from diving school and qualified as a Second Class Navy Diver. *Id.* at 401–02.  Plaintiff was then assigned to Mobile Diving and Salvage Company Two where he performed numerous dives as part of salvage operations and joint naval exercises from at least January 2009 until October 2012. *Id.* at 160–66.

A performance evaluation report from this period characterizes Plaintiff as a "devoted and tireless performer," reflecting the integral and admired nature of his skills as a diver. *See id.* at 165; *see also id.* at 163 (describing Plaintiff as an "effective team member with job accomplishment as a top priority"); *id.* at 161 (praising, among other qualities, Plaintiff's diving and management skills). In March 2010, Plaintiff earned the Navy and Marine Corps Achievement Medal and the Humanitarian Service Medal for the superior performance of his duties during a deployment to Haiti where he cleared and assisted in the re-opening of critical commercial seaports damaged during the earthquake that occurred there earlier that year. *Id.* at 167, 400.

After his deployment to Haiti, Plaintiff was deployed to the Persian Gulf in September 2010 where he conducted 41 anti-terrorism force protection dives and served as lead diver for three other dives. *Id.* at 165. In July 2012, he participated in a mission to Canada where his efforts proved "vital" in a diving operation, in which he successfully excavated, recovered, and repatriated three U.S. Army Air Corps personnel lost since 1942 in 120 feet of water off the coast of Nova Scotia. *Id.* at 39, 161.

Diving is a hazardous occupation in the Navy and, unfortunately, Plaintiff suffered two diving-related medical events during his military service. In 2010, he experienced a head trauma as a result of striking his head during a dive.[3] *Id.* at 8, 39, 77. Additionally, during a dive in support of the mission to Nova Scotia, Plaintiff suffered from hypoxia and type 2 decompression sickness. *Id.* at 39, 78. In relation to the latter event, crew members pulled Plaintiff out of the water after he lost consciousness, and a doctor examined him before he returned to service later that same day. *Id.* at 39. Following this event of hypoxia, Plaintiff reportedly began experiencing

---

[3] Plaintiff also experienced a second head injury in 2012 when he hit his head on the ground while playing recreational football. AR 8, 39, 78.

emotional and behavioral changes and consuming alcohol excessively. *Id.* at 39, 78. It was during this time in 2012 that Plaintiff also separated from his wife. *Id.* at 39.

In October 2012, the Navy transferred Plaintiff to the United States Naval Academy in Annapolis, Maryland. *Id.* at 158. Within months, Plaintiff's conduct began to suffer. In January 2013, he was counseled for an unauthorized absence from a command physical fitness session and substandard appearance during a command indoctrination course. *Id.* at 417. Plaintiff received further counseling in March 2013 after being cited by local law enforcement for reckless driving after he was stopped for speeding in a government-issued vehicle. *Id.* at 418. Then, on April 14, 2013, Plaintiff was cited by the Annapolis Police Department for, among other charges, driving a vehicle while impaired by alcohol ("DWI"). *Id.* at 420. Plaintiff's medical records show that, during this period of frequent misconduct, he received some outpatient mental health treatment. A February 2013 mental health record notes diagnoses of adjustment disorder with anxiety and depressed mood, as well as marital problems. *Id.* at 219.

As a result of the DWI citation, the Navy issued Plaintiff a non-judicial punishment ("NJP"), which included, *inter alia*, forfeiture of pay, reduction in pay rate, and community service. *Id.* at 157, 422. The aspects of the NJP related to Plaintiff's pay were suspended for six months. *Id.* at 422. Because of the NJP, the Navy conducted a performance evaluation of Plaintiff, covering the period of March 16, 2013, to May 13, 2013. *Id.* at 156–57. This evaluation described Plaintiff as "an above average Sailor who made a serious mistake" from which he could recover with mentoring and strong personal desire. *Id.* at 157. It reflected that Plaintiff at that time adequately performed the duties of a Second Class Navy Diver, which included the operation, maintenance, and repair of diving equipment, and collateral duties including the performance of funeral honors. *Id.* at 156. Plaintiff was rated as meeting standards in all categories, except for

"military bearing/character."  *Id.* at 156–57.  After issuing the NJP, it appears the Navy also suspended Plaintiff's diving qualifications due, in part, to "personal issues" identified as "family separation" and Plaintiff's receipt of the March 2013 speeding ticket while driving in a government vehicle.  *Id.* at 435 (noting that Plaintiff was "on a suspend bust from the former Commandant this spring").

Finally, on July 21, 2013, the Annapolis Police Department arrested Plaintiff for theft, disorderly conduct, and resisting arrest after he left a restaurant without paying his bill.  *Id.* at 426. The arresting officer observed that Plaintiff's eyes were watery and glassy, his speech slurred, and his breath emitted a strong odor of alcohol.  *Id.*  On July 30, 2013, Plaintiff received notice that the Navy was processing him for administrative separation due to misconduct, specifically the commission of a serious offense.  *Id.* at 149–50.  The Navy additionally vacated the suspension of the forfeiture of pay and reduction in pay rate aspects of his earlier NJP.  *Id.* at 433.  It also removed Plaintiff's Second Class Diver classification on September 24, 2013.  *Id.* at 155.

Between August and December 2013, Plaintiff was temporarily assigned to Fort Belvoir Community Hospital in Virginia where he successfully graduated from a military in-patient rehabilitation program and an outpatient dual-diagnoses therapy program where he was treated for depression and alcohol use disorder.  *Id.* at 67, 113, 154.  During his time at Fort Belvoir Community Hospital, Plaintiff underwent neuropsychological testing to evaluate whether he suffered from a traumatic brain injury ("TBI").  *Id.* at 35.  According to the December 9, 2013 report of the Defense Health Agency ("DHA"), the evaluation concluded that Plaintiff had neurocognitive deficits that required "ongoing and persistent treatment."  *Id.*  These deficits included "circumscribed cognitive difficulties on tasks requiring mental processing speed, slowed fine motor and dexterity and visuospatial processing, complex problem solving[,] and memory."

*Id.* The DHA report concluded that some of Plaintiff's cognitive difficulties were attributable to multiple etiologies including childhood maltreatment, fetal alcohol exposure, and hypoxia episodes from multiple long-term dives and reduced oxygen saturation. *Id.* It also noted Plaintiff's "repeated symptom of 'odd' sensory feelings and reduced motor functioning from dives," as well as evidence of a small cyst in his brain complicating his sensory and motor functioning. *Id.* at 36. Plaintiff was ultimately diagnosed with major depressive disorder, cognitive disorder, antisocial traits, potential hypoxia, and retrocerebellar cyst. *Id.*

On December 6, 2013, the Superintendent of the Naval Academy issued a decision to discharge Plaintiff due to his misconduct. *Id.* at 145. Plaintiff's separation caused a final performance evaluation to be conducted, covering the period of May 14, 2013, to December 20, 2013. *Id.* at 154–55. The evaluation report noted Plaintiff was performing the duties of a maintenance technician during this period, and his performance was evaluated as "meeting standards" for all categories of performance traits except for the trait of "military bearing/character." *Id.* Plaintiff also underwent a pre-separation medical assessment, which noted that "TBI, depression and anxiety disorder affect[ed] [Plaintiff's] capacity to continue diving." *Id.* at 452; *see id.* at 453 (listing diagnoses of depression, anxiety disorder, alcohol dependence, and "neurological [and] cognitive impairment"). Nonetheless, the assessment found Plaintiff qualified for service and separation. *Id.* at 453.

Although his command had become aware of Plaintiff's TBI evaluation and neurocognitive deficits during the separation process, *id.* at 436–37, Plaintiff was officially discharged from the Navy for misconduct on December 20, 2013, with his rate reflecting "ND3" or Third Class Navy Diver, and the character of his service noted as "under honorable conditions (general)," *id.* at 399. *See also id.* at 146–48.

**C.      Procedural Background**

1.      <u>Decision of the Naval Discharge Review Board ("NDRB")</u>

On February 3, 2015, Plaintiff sought a change in his characterization of and narrative reason for discharge from the NDRB on equity and propriety grounds.  *Id.* at 370, 372. Specifically, Plaintiff requested a discharge upgrade from a general to honorable characterization and an alteration to the statements of narrative reason and separation authority included on his discharge document.  *Id.* at 372.

After providing an in-person hearing, the NDRB rendered its final decision on October 14, 2015, granting Plaintiff's request for relief.  *Id.* at 134.  The NDRB considered each of the issues raised by Plaintiff, rejecting all his arguments alleging that the Navy committed some type of legal error preceding and/or during the separation process.  *Id.* at 135–38.  It specifically found that Plaintiff's July 2013 arrest was the result of "conscious decisions that violate[d] the tenants of honorable and faithful service."  *Id.* at 138.

The NDRB, however, determined that relief was warranted "based on equitable grounds due to [Plaintiff's] service connected cognitive defects."  *Id.*  (finding the "record of evidence clearly show[ed] [Plaintiff] was engaged in hazardous service that resulted in a definite, documented, causal relationship between his hazardous service and his resulting disabilities").  The NDRB acknowledged that, although Plaintiff "incurred his disabilities from his hazardous service," that was "not sufficient by itself to support an upgrade determination."  *Id.*  Rather, the NDRB based its decision on the "totality of [Plaintiff's] service record, the start date of his mental health counseling and evaluation, the manifestation dates of his misconduct, and his post-service actions and treatment records with respect to the equity of his discharge characterization and narrative reason for separation."  *Id.*  Notably, the NDRB "found [Plaintiff's] discharge was proper

and equitable at the time of discharge." *Id.* at 139.  It based its upgrade determination "on matters of equity related to [Plaintiff's] post-service diagnoses of medical conditions related to his hazardous duty diving operations." *Id.* at 139.  On that ground alone, the NDRB directed that Plaintiff's discharge be changed to "honorable" and the narrative reason be changed to "secretarial authority." *Id.*

     2.    <u>Decision of the BCNR</u>

On December 20, 2016, over a year after the NDRB upgraded his discharge, Plaintiff submitted an application to the BCNR requesting the Board correct his military records to reflect a disability retirement. *Id.* at 10.  Plaintiff asserted that the NDRB's decision to upgrade his characterization to a fully honorable discharge, in addition to his VA disability rating, entitled him to an award of 60 percent military medical retirement pay.[4] *Id.*

On July 19, 2017, the Chairman of the BCNR requested comments and recommendations on Plaintiff's claim from the Director of the Navy's Council of Review Boards ("CORB"). *Id.* at 125.  In response, an advisor of the Senior Medical Officer of CORB issued an advisory opinion concluding that his review of the available evidence did not support Plaintiff's request for disability retirement. *Id.* at 127.  In sum, the advisor stated that "objective evidence" established Plaintiff performed his duties adequately at the time of his separation. *Id.* at 130.  He further noted that Plaintiff's "largely alcohol-related misconduct . . . appears to have led to his discharge," and the misconduct did not "result[] from a legally exculpating level of psychological impairment incident to a potentially compensable psychiatric condition." *Id.*  Finally, the advisor observed

---

    [4] In September 2014, the VA issued Plaintiff a combined disability rating of 60 percent resulting from his medical impairments, which included tinnitus, major depressive disorder, cognitive deficits, and motor slowing due to decompression sickness and hypoxic episodes.  AR 462–66.

that, per his review of the record, none of "the involved health care evaluators and providers of record contemporary with [Plaintiff's] active service felt him to be unfit or that referral to the . . . PEB was warranted." *Id.* Had such a referral occurred, the advisor opined that "a finding of fit to continue naval service would have been the likely result." *Id.* at 131. On October 31, 2017, the Director of CORB concurred with the recommendation of the Senior Medical Advisor. *Id.* at 132.

In a letter dated December 12, 2017, serving as a rebuttal to the CORB advisory opinion, Plaintiff—through counsel—argued that he "suffered from significant cognitive and emotional impairment as well as untreated PTSD at the time of separation" and that a "preponderance of the evidence suggest[ed] that these medical impairments directly relate[d] back to [Plaintiff's] in-service injuries and existed in 2013." *Id.* at 13. Plaintiff disagreed with several of the Senior Medical Advisor's assertions, including that: Plaintiff's alcohol-related misconduct that resulted in his separation did not result from a "legally exculpating level of psychological impairment incident to a potentially compensable psychiatric condition," Plaintiff's impairments did not warrant a referral to the PEB, or a referral would have resulted in a finding of Plaintiff being fit for continued naval service. *Id.* at 13–17. Plaintiff argued that SECNAVINST 1850.4E required Plaintiff's referral to the PEB instead of being administratively separated. *See id.* at 17 (citing SECNAVINST 1850.4E, encl. (3), ¶¶ 3106, 3202.g).[5] Plaintiff offered no additional or alternative bases to argue that his disabilities should have prevented his separation or taken precedence over his separation due to misconduct. *See id.*

The BCNR denied Plaintiff's application on February 5, 2018, finding no error or injustice warranted correction to Plaintiff's record. *Id.* at 5–6. The Board also rejected Plaintiff's request

---

[5]   Plaintiff's rebuttal letter cites ¶ 3202.b of SECNAVINST 1850.4E; however, the language quoted in the letter appears in ¶ 3202.g. *See* AR 17.

to personally appear before it and considered Plaintiff's case based on the record. *Id.* at 6–7. The Board "substantially concurred" with the CORB advisory opinion and found that objective evidence, *i.e.*, Plaintiff's last two performance evaluations from 2013, showed that Plaintiff adequately performed the duties of his office, grade, rank, or rating, despite his diagnosed disabilities. *Id.* at 6. The Board also concurred with the NDRB's finding that the Navy properly processed and discharged Plaintiff for misconduct. *Id.* Like the NDRB, the Board found no evidence demonstrating that Plaintiff was not criminally responsible for his misconduct, such as any evidence indicating mental incompetence. *Id.* Because of this, even assuming the record supported a finding of unfitness, the Board concluded that Plaintiff's misconduct separation processing took precedence over any right to be referred to the DES. *Id.*

3.   The Instant Action

Plaintiff filed suit in this Court on May 8, 2020. Pl.'s Compl., ECF No. 1. In accordance with the Court's scheduling order, *see* ECF No. 7, Defendant filed the Administrative Record on August 14, 2020, *see* ECF No. 8. On September 7, 2020, Plaintiff filed his Motion for Judgment on the Administrative Record, arguing that the BCNR's decision to deny him placement on the disability retirement list was arbitrary and capricious, contrary to law, and/or unsupported by substantial evidence. *See* Pl.'s Mot. for J. on Admin. R., ECF No. 9; Pl.'s Br. in Supp. of Mot. for J. on Admin. R., ECF No. 10; Pl.'s App., ECF No. 10-1. According to Plaintiff, the Board failed to properly apply and adhere to relevant naval disability retirement regulations, under which he should have been found unfit at the time of his separation, and naval policies issued after his separation that support the prioritization of disability retirement over separation based on misconduct.

Defendant subsequently cross-moved for judgment on the administrative record, asserting that the BCNR's decision to deny Plaintiff's request for disability retirement was rational and supported by substantial evidence. *See* Def.'s Cross Mot. for J. on Admin. R., ECF No. 11. According to Defendant, the Board reasonably determined that (1) Plaintiff was able to perform his duties at the time of his separation despite his medical conditions, and (2) his misconduct proceedings took precedence over his disability processing.

## II. DISCUSSION

### A.   Standard of Review

Pursuant to RCFC 52.1, judgment on the administrative record is "properly understood as . . . an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). In contrast to the standard for summary judgment, "the standard for judgment on the administrative record is narrower" and involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [challenged] decision was not in accordance with the law." *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357). Therefore, a genuine issue of disputed fact does not prevent a court from granting a motion for judgment on the administrative record. *See Bannum*, 404 F.3d at 1357.

For military pay cases, a court will not disturb a decision rendered by a military correction board unless the decision is "arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *See Barnes v. United States*, 473 F.3d 1356, 1361 (Fed. Cir. 2007). A decision is arbitrary and capricious when the agency decision-maker, such as the BCNR, "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006) ("[W]hen a service member does pursue . . . relief [from a military correction board], the Court of Federal Claims reviews the Board's action under the same [Administrative Procedure Act ("APA")] standard as any other agency action." (citing *Martinez v. United States*, 333 F.3d 1295, 1314 (Fed. Cir. 2003))). Applying the APA standard of review does not require "a reweighing of the evidence, but [simply] a determination whether *the conclusion being reviewed* is supported by substantial evidence." *Heisig v. United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983). "Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence." *In re NuVasive, Inc.*, 842 F.3d 1376, 1379–80 (Fed. Cir. 2016) (quoting *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000)). If a reasonable mind would accept the evidence as adequate to support a conclusion, the evidence is substantial. *See Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

Given this standard, the Court's review of a military correction board's decision-making process is "necessarily limit[ed] . . . to the administrative record." *Metz*, 466 F.3d at 998. The plaintiff has the burden to prove the board's decision was arbitrary and capricious through "cogent and clearly convincing evidence," *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed. Cir. 1986), and "must overcome the strong, but rebuttable, presumption that the administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith," *Porter v. United States*, 163 F.3d 1304, 1316 (Fed. Cir. 1998) (quoting *Sanders v. United States*, 594 F.2d 804, 813 (Ct. Cl. 1979)). In assessing Plaintiff's claims, the Court must be cognizant that it is the military— and not the judiciary—that bears the responsibility for determining the fitness of a service member. *Heisig*, 719 F.2d at 1156. "[C]ourts cannot substitute their judgment for that of the military

14

departments when reasonable minds could reach differing conclusions on the same evidence." *Id.*; *see, e.g.*, *Reale v. United States*, 208 Ct. Cl. 1010, 1013 (1976) (disavowing the idea of the court operating as "a sort of super Correction Board"); *Voge v. United States*, 844 F.2d 776, 782 (Fed. Cir. 1988) (citing *Reale*, 208 Ct. Cl. at 1013).

**B.     The BCNR Failed to Consider Important Aspects and Relevant Criteria of the Applicable Naval Disability Regulation in Denying Plaintiff Disability Retirement.**

Plaintiff argues that the BCNR's decision to deny his request for disability retirement was arbitrary and capricious because the Board failed to consider all relevant factors, as set forth in SECNAVINST 1850.4E and the Navy's Manual of the Medical Department ("MANMED"),[6] and made factual findings regarding Plaintiff's fitness not supported by substantial evidence.  ECF No. 10 at 15.  Defendant disagrees, arguing that the Board's determination of Plaintiff's fitness for duty at the time of his discharge (and thus ineligibility for disability retirement) was supported by substantial evidence.  ECF No. 11 at 20.  Defendant further contends that Plaintiff waived his arguments related to the Board's failure to consider all relevant factors necessary to resolve his application by not raising those arguments directly to the Board.  *See id.*  On these issues, Plaintiff has the better claim.

1.     Plaintiff's Common Military Tasks

Under SECNAVINST 1850.4E, the determination of a member's ability to perform his or her duties (*i.e.*, fitness for duty) should take into consideration the member's common military tasks.  Plaintiff argues that, in making its finding, the Board failed as a threshold matter to consider "what tasks [Plaintiff] would be reasonably expected to perform as a Navy diver."  ECF No. 10 at

---

[6]  MANMED establishes specialized standards and physical qualifications for diving duty that must be met for continued diving duty service.  *See* ECF No. 10-1 at 305–10 (excerpt of MANMED, art. 15-102 (Aug. 12, 2005)).  These standards include neurological and psychiatric criteria.  *See id.* at 308–09.

16; *see* Pl.'s Reply at 12–13, ECF No. 12.  Instead, Plaintiff asserts that the Board improperly focused on Plaintiff's final two performance evaluations, which covered Plaintiff's assignment to the Naval Academy where his duties were not fully reflective of his service as a Navy diver.  ECF No. 10 at 16.  Defendant argues that no Navy regulation requires the BCNR to asses a member's common military tasks at the "granular level" that Plaintiff suggests.  Def.'s Reply at 9, ECF No. 13.  Rather, it contends that the Board's reliance on Plaintiff's final performance evaluations to determine whether he could perform the duties of his rating was rational and in accordance with naval regulations, and substantially supported its decision.  *Id.*; *see* ECF No. 11 at 23.

SECNAVINST 1850.4E does not define the level of detail required by the common-military-task consideration.  However, the overall standard used for determining disability (which is essentially the same standard for considering common military tasks) shows that a mere review of whether a member was adequately performing duties—regardless of what those were—immediately before separation is not sufficient.  The standard requires "relating the nature and degree of physical disability of the member to the requirements and duties that member *may reasonably be expected to perform in his or her office, grade, rank or rating*."  SECNAVINST 1850.4E, encl. (3), ¶ 3301 (emphasis added).  A disability determination must therefore connect the review of a member's performance of duties with a consideration of the duties that are within the member's common military tasks.   Otherwise, as Defendant correctly observes, SECNAVINST 1850.4E makes clear that performance evaluations are relevant evidence of the capacity of a member suffering from chronic medical impairments to perform duties reasonably expected of him or her.  *See* ECF No. 11 at 23; SECNAVINST 1850.4E, encl. (3), ¶¶ 3205, 3303.b.

Recent cases from other judges of this court provide helpful guidance on this very issue. *See Nyan v. United States*, 153 Fed. Cl. 234 (2021), *vacated in part on reconsideration*, 154 Fed.

Cl. 463 (2021); *O'Hare v. United States*, No. 18-1746C, 2021 WL 3852225 (Fed. Cl. Aug. 27, 2021). *Nyan* involved a review of a fitness determination made by an Informal Physical Evaluation Board ("IPEB") of a service member employed as a Hospital Corpsman. 153 Fed. Cl. at 242. The court in *Nyan* held that the IPEB's determination was not supported by substantial evidence because "the IPEB did not make any findings regarding what duties a Hospital Corpsman at the E4 grade is expected to perform." *Id.* Instead, the IPEB based its finding on the plaintiff's most recent performance evaluation reflecting his "exceptional" performance of administrative tasks during a limited duty assignment. *Id.* at 242–43. In rejecting the Government's argument that administrative tasks also fell within the scope of the plaintiff's rating, the court observed that the question of fitness was not premised on "whether [the plaintiff] was disabled from performing any and all work that a Hospital Corpsman might be assigned to perform, but rather whether he was disabled from performing work that a Hospital Corpsman at the E4 grade could 'reasonably be expected to perform.'" *Id.* at 243 (quoting SECNAVINST 1850.4E, encl. (3), ¶ 3301). The court found evidence in the administrative record demonstrating that, "as a Hospital Corpsman at the E4 grade, [the plaintiff] was expected to perform a wide range of duties that went beyond sitting at a desk doing paperwork." *Id.* The court in *Nyan* also examined the plaintiff's duties prior to his placement on limited duty and found it "instructive" that his prior duties were not administrative in nature. *See id.* at 244.

*O'Hare* involved the review of a BCNR decision denying disability retirement to a service member who also was previously employed as a Hospital Corpsman. 2021 WL 3852225, at *1. The plaintiff argued that the BCNR improperly relied on his final fitness report as evidence that he could perform the duties of a Hospital Corpsman because, at the time of the report, he was performing only administrative work at the hospital. *See id.* at *7. The court in *O'Hare* found the

BCNR's reliance on the fitness report to be reasonable because the Board explicitly determined that the plaintiff was working within the scope of his duties when performing the administrative tasks and the Board's finding was consistent with the written descriptions of a Hospital Corpsman's duties. *See id.* at *7–*8.  The court held that it should defer to the Board's definition of a service member's duties and its "express conclusion—supported by the plain text of Navy regulations—that [the plaintiff's] administrative activities were within the scope of his duties." *Id.* at *8 (citing *Wronke*, 787 F.2d at 1576).  *O'Hare* distinguished the facts of *Nyan*, finding that unlike in the IPEB decision at issue in *Nyan*, the BCNR made explicit findings about the types of duties the plaintiff in *O'Hare* was expected to perform as a Hospital Corpsman, including the administrative work he was successfully performing immediately prior to his separation.  *See id.*

Here, Plaintiff's penultimate performance evaluation—covering the period of March 2013 to May 2013—indicates that Plaintiff was at the ND2 rating primarily performing the duties of a Second Class Navy Diver, which included the "operation, maintenance, and repair of diving life support equipment."  *See* AR 156.  It also noted that he performed collateral duties including, among others, funeral honors.  *Id.*  According to the evaluation, Plaintiff met the standards in all categories of performance traits except for "military bearing/character," in which he fell below standards due to his drunken operation of a vehicle.  *Id.* at 157.  The evaluation did not include comments on performance providing any further detail about Plaintiff's duties during this period. *See id.*

Plaintiff's final evaluation—covering the period of May 2013 to December 2013—reflects that Plaintiff was at the ND3 rating primarily performing the duties of a Maintenance Technician-4 assigned to the Hull Division of the Small Craft Repair Department.  *Id.* at 154.  It also indicates that Plaintiff was on temporary duty assignment to Ft. Belvoir Community Hospital from

September 24, 2013, to December 13, 2013, which overlaps with the period he received in-patient treatment for depression and alcohol disorder. *Id.*; *see id.* at 67. Again, according to the evaluation, Plaintiff met the standards in all categories of performance traits except for "military bearing/character," in which he was graded as "progressing." *See id.* at 154–55. Like the previous evaluation, no further information about his duties during this period was provided in the comment section. *See id.* at 155.

The Board characterized these last two performance evaluations as "objective evidence," persuading it that Plaintiff could perform the duties of his office, grade, rank, or rating despite the existence of Plaintiff's diagnosed disabilities. *Id.* at 6. The Board found "[m]ost important[]" the fact that Plaintiff's final evaluation occurred after the DHA diagnosed Plaintiff with, *inter alia*, neurocognitive deficits in its December 9, 2013 report and emphasized that fact as "convincing evidence" that Plaintiff was fit to perform his duties. *See id.* It, however, made no explicit or implicit finding regarding what duties a Second Class Navy Diver at the E4 grade is reasonably expected to perform or finding that the duties Plaintiff was performing during the periods covered by the two evaluation reports included such duties. *See id.* at 5–7.

Moreover, the performance evaluations do not provide much information at all about the specific duties Plaintiff was performing at the Naval Academy from March to December 2013. Unlike all the other evaluations in the record, his final two evaluations lack explanatory comments about his duties. *Compare id.* at 159, 161, 163, 165, 167, *with id.* at 155, 157. And of course, Plaintiff was not performing *any* duties from September 24 to December 13, 2013, while he was being treated at Ft. Belvoir Community Hospital. *See id.* at 154.

Citing a Navy Diver rating description provided in MILPERSMAN 1220-100, ch. 43 (May 30, 2013), Plaintiff contends the "common duties of a Navy diver include descending into the

ocean at any depth" and working in, among other conditions, "hostile environments that include cold muddy water where tasks can be completed only by feel."[7]  ECF No. 10 at 16 (citing ECF No. 10-1 at 311).  Plaintiff asserts that his duties during his last two evaluation periods while stationed at the Naval Academy involved servicing diving equipment and performing funeral honors and, therefore, do not reliably demonstrate that he could perform the duties reasonably expected of a Second Class Navy Diver.  *See id.*  Plaintiff argues that the Board erred by focusing on these final evaluations, where an examination of his performance evaluations pre-dating his assignment to the Naval Academy evidenced the types of duties he was reasonably expected to perform.  *Id.*  These previous evaluations depict Plaintiff as a skilled and tireless diver, valuably contributing to salvage diving operations and joint naval exercises.  *See, e.g.*, AR 161, 165.

To be sure, Plaintiff's prior performance evaluations reflect that he operated and maintained diving equipment as part of his primary duties as a Second Class Diver prior to his Naval Academy assignment.  *See, e.g.*, *id.* at 161, 163, 166.  He continued to perform those duties after transferring to the Naval Academy and before his instances of misconduct.  *See id.* at 158, 159.  Like *Nyan*, however, the record before the BCNR showed that as a Second Class Navy Diver Plaintiff was expected to perform and did perform a broader range of duties.  *See id.* at 158–67. Because "the question is not whether [Plaintiff] was disabled from performing any and all work that a [Navy Diver] might be assigned to perform," that he was maintaining diving equipment during the periods covered by the final evaluations does not necessarily equate to a finding that he was fit to perform work that a member in his office, grade, rank, or rating would "reasonably be

---

[7]  Plaintiff attached a number of documents as an appendix to his motion, primarily including official Navy and Department of Defense regulations and other policies.  *See generally* ECF No. 10-1.  Defendant does not dispute that the Court may consider these policy documents in resolving the parties' motions.  ECF No. 11 at 15 n.3.

expected to perform."[8]  *Nyan*, 153 Fed. Cl. at 243 (quoting SECNAVINST 1850.4E, encl. (3), ¶ 3301).

The deficiencies in the Board's consideration of Plaintiff's common military tasks are more pronounced given the extra importance it accorded to his final performance evaluation.  *See* AR 6. The Board's decision did not mention that this evaluation covered a period in which Plaintiff was primarily performing the duties of a maintenance technician—not a Second Class Navy Diver.  *See id.* at 5–7.  Nor did the decision acknowledge that during the period covered by this evaluation Plaintiff lost his Second Class Navy Diver classification, *see id.*, which may be why his primary duty abbreviator changed to maintenance technician, *see id.* at 154.[9]  Because the Board's decision failed to explain the connection between the duties performed by a maintenance technician and the duties that a Second Class Navy Diver at the E4 grade may reasonably be expected to perform, the Court is left to guess whether the Board's fitness determination properly took these facts into consideration.  *See Nyan*, 153 Fed. Cl. at 245; *see also Joslyn v. United States*, 110 Fed. Cl. 372,

---

[8]  Defendant argues that, in addition to maintaining equipment, Plaintiff actually dove while on assignment at the Naval Academy, showing that he was physically able to dive despite his conditions.  ECF No. 11 at 25.  The performance evaluation on which Defendant relies does not clearly establish this fact.  Under the topic "Motivated Diver," the evaluation comments that he "[p]layed an essential role in salvage and recovery of eight Yard Patrol craft rub rails from Naval Support Activity, Annapolis basin, saving the Navy $8,000 in replacement costs."  AR 159.  It does not explain what "role" he played.  The other activities described under this topic refer to qualifications for watchstanding duties, which to the Court's understanding do not include diving. *See id.*  The topic heading may, therefore, simply refer to his rating and not the performance of diving duties during the evaluation period.  Moreover, as Plaintiff notes, even if Plaintiff were physically able to dive, it does not necessarily mean he was medically able to dive.  *See* ECF No. 12 at 12.

[9]  Although the Navy removed his classification on September 24, 2013, *see* AR 155, Plaintiff was discharged with the rating of Third Class Navy Diver, *see id.* at 399.  Therefore, the point remains the same; the record is devoid of any indication that Plaintiff's capacity to successfully perform the duties of a maintenance technician translates to a finding that he could successfully perform the duties of a Navy Diver, regardless of the specific classification.

389 (2013) (observing the substantial evidence standard as requiring review of whether military disability evaluation board's decision took into consideration relevant factors).

That is not to say that the performance evaluations necessarily preclude a fitness determination in this case.  It may be possible, for example, that the duties of a maintenance technician sufficiently overlap with the duties of a Navy Diver, making the final performance evaluation pertinent evidence in assessing Plaintiff's fitness.  *See* ECF No. 10-1 at 311–12 (showing that Navy Divers may be assigned to ship repair units and that civilian occupations equivalent to the Navy Diver job include "maintenance and repair workers").  Because this Court defers to the BCNR on the substantive question of a service member's fitness, remand would be appropriate for the BCNR in the first instance to reconsider Plaintiff's performance evaluation reports and further explain its determination with respect to Plaintiff's common military tasks.  *See Nyan*, 154 Fed. Cl. at 467.  As explained below, however, remand is unnecessary since the Board's decision can be upheld on an independent, alternative ground.

2.    Other Considerations for Determining Reasonable Performance of Duties

Plaintiff contends that the Board also failed to consider other criteria of SECNAVINST 1850.4E, including Plaintiff's deployability and the risk Plaintiff's impairments may have posed to himself and other service members, as well as the special medical requirements for divers as set forth in the MANMED.  ECF No. 10 at 17–18, 19–20.  In response, Defendant primarily asserts that Plaintiff has waived these arguments because he "did not argue to the BCNR that any deployment restrictions, risk to others, or MANMED standards for divers made him physically unfit for duty."  ECF No. 11 at 26; *see* ECF No. 13 at 12.

22

In addition to common military tasks, SECNAVINST 1850.4E mandates that a fitness determination "includes consideration of," as relevant here, deployability[10] and special qualifications.  SECNAVINST 1850.4E, encl. (3), ¶ 3304; *see id.* ¶ 3307 (identifying special qualifications to include "diving qualifications").  MANMED identifies the types of medical conditions that would cause a service member to lose his or her diving qualifications and is therefore relevant to the special-qualifications inquiry mandated by SECNAVINST 1850.4E.  *See* ECF No. 10-1 at 305–10.  The instruction expressly states that the considerations of deployability and special qualifications are not to be used individually as a sole basis for determining a service member's fitness.  *See* SECNAVINST 1850.4E, encl. (3), ¶ 3307.  The instruction, however, does not foreclose the possibility that these considerations, when evaluated collectively with the other identified considerations (including common military tasks), could have the combined effect of supporting a determination of unfitness.  *See id.* ¶¶ 3304, 3307.  Therefore, while they are not individually determinative, they are relevant considerations that should be examined when assessing a service member's fitness.  *See id.* ¶ 3304.  SECNAVINST 1850.4E also allows for— but does not require—the consideration of whether a member's "[m]edical condition represents a decided medical risk to the health of the member or to the welfare of other members were the member to continue on active duty or in an Active Reserve status."  *Id.* ¶ 3302.b.(1).

There is no dispute that the BCNR's decision does not reflect the Board's consideration of any of the factors identified by Plaintiff—*i.e.*, deployability, special qualifications, and risk.

---

[10]   "Deployable" is defined as a "determination that the member is free of a medical condition(s) that prevents positioning the member individually or as part of a unit, with or without prior notification, to [a] location outside the [c]ontinental United States for an unspecified period of time."  SECNAVIST 1850.4E, encl. (2), ¶ 2019.  "Nondeployability does not necessarily equate to Unfitness," *id.*, and the "[i]nability to perform the duties of [the member's] office, grade, rank, or rating in every geographic location and under every conceivable circumstance will not be the sole basis for a finding of Unfit," *id.*, encl. (3), ¶ 3304.a.(3).

Rather, Defendant argues, primarily relying on two cases, that Plaintiff waived these arguments by raising them for the first time in the proceedings before this Court. *See* ECF No. 13 at 11 (citing *Metz* and *Rock v. United States*, 112 Fed. Cl. 113 (2013)). *Metz* and *Rock* are distinguishable. Both cases involved the waiver of new arguments that could have appropriately been raised during prior agency proceedings and that, absent being raised, were not arguments that the agency would otherwise reasonably be expected to address. *See Metz*, 466 F.3d at 999 (holding the plaintiff waived an ineffective assistance of counsel argument where he did not raise such claim in his petition to a corrections board for review of his voluntary discharge from the Air Force); *Rock*, 112 Fed. Cl. at 128 (holding that the plaintiff waived certain arguments that could have been raised in his administrative appeal of a formal PEB decision assigning him a 20 percent total disability rating and removing him from the temporary disability retired list).

Here, unlike in *Metz*, Plaintiff is not raising "new" arguments that were not before the BCNR. *See* Metz, 466 F.3d at 999. The issue before the BCNR was Plaintiff's claim of unfitness, and Plaintiff argues that the Board failed to consider relevant criteria and factors that SECNAVINST 1850.4E required it to consider when evaluating his claim. *See* ECF No. 10 at 17–20. Unlike in *Rock*, where the plaintiff administratively appealed his fitness determination before seeking judicial review of the denial of his appeal, Plaintiff was not referred for a formal PEB and thus this Court is reviewing the Board's determination in the first instance of Plaintiff's fitness. *See Rock*, 112 Fed. Cl. at 127–28. The nature of Plaintiff's argument is predicated on the Board first adjudicating his claim because it was only after the Board issued the decision that Plaintiff became aware of and could object to the deficiencies in its application of SECNAVINST 1850.4E.

Defendant cites no authority for the proposition that the BCNR need not apply aspects of a directly relevant, binding Navy instruction simply because a service member did not specifically

identify the paragraphs and sub-paragraphs applicable to his case. Just as our legal system is founded on the notion that individuals interacting with the Government are presumed to know the law, *Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 409, 416 (2003), *rev'd on other grounds sub nom. Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339 (Fed. Cir. 2005), so too should we expect that an administrative body charged with determining the fitness of a service member knows the legal standard to be applied. There are no meaningful fairness concerns that would weigh in favor of a waiver finding. *See Metz*, 466 F.3d at 999. Accordingly, the Court finds that Plaintiff did not waive these arguments by not specifically raising them before the Board.

Turning to the merits, neither the Board's determination, nor the advisory opinion on which it relied, demonstrate any consideration of whether Plaintiff's medical conditions affected his deployability or special qualifications as a Navy Diver.[11] *See* AR 5–7, 127–31. As Plaintiff notes, Department of Defense Instruction ("DoDI") 6490.07 provides that, in general, service members with certain medical conditions "shall not deploy unless a waiver is granted." ECF No. 10-1 at 325 (Deployment-Limiting Medical Conditions for Service Members and DoD Civilian Employees, DoDI 6490.07, encl. (3) (Feb. 5, 2010)); *see* ECF No. 10 at 17. This includes, among others, conditions that require frequent clinical visits and certain mental health disorders. ECF

---

[11] Indeed, the Board's decision does not specifically identify *at all* the regulatory provisions or other policies that it considered. *See* AR 5 (stating only that "[d]ocumentary material considered by the Board consisted of . . . applicable statutes, regulations and policies"); *see id.* at 127 (broadly listing as a reference to the CORB advisory opinion the "SECNAVINST 1850.4 series"). Nor did Defendant include any regulatory or policy materials in the administrative record, despite the express statement that such documents were reviewed and considered by the Board. *Marathon Oil Co. v. United States*, 17 Cl. Ct. 116, 121 (1989) ("[T]he complete administrative record . . . consist[s] of 'all the documents and materials that were directly or indirectly considered by the decision-makers at the time the decisions were rendered.'" (quoting *Tenneco Oil Co. v. Dep't of Energy*, 475 F. Supp. 299 (D. Del. 1979))). It does not escape the Court's notice that the record is conspicuously vague as to the regulatory provisions and policies the Board applied, which frustrates the Court's ability to evaluate whether the Board's decision-making process followed Navy procedures.

No. 10-1 at 325, 327. The DHA report demonstrates that shortly before his discharge Plaintiff had psychological diagnoses of major depressive order and cognitive disorder and suffered from neurocognitive deficits that "require[d] ongoing and persistent treatment," including "behavioral health, occupational therapy, [and] vocational therapy." *See* AR 35.

Additionally, Plaintiff notes that the MANMED provisions applicable to Navy Divers disqualify from diving duty (absent a waiver): service members who have suffered decompression sickness and are experiencing neurological symptoms; members who have certain psychiatric diagnoses; or members who have a diagnosis of alcohol dependency, alcohol abuse, or alcohol incident and have not completed required treatment. *See* ECF No. 10-1 at 308–09; ECF No. 10 at 19–20. Evidence in the administrative record shows Plaintiff has a history of type 2 decompression sickness, neurocognitive issues, Axis I and II psychiatric diagnoses, and alcohol use disorder. *See* AR 35, 39, 67, 78, 219; *see also id.* at 452 (noting that Plaintiff's diagnoses "affect[ed] his capacity to continue diving").

Whether and how these considerations would have affected Plaintiff's fitness determination is not a matter within this Court's judicial province. *Heisig*, 719 F.2d at 1156. The Court, however, is empowered to review whether the BCNR "entirely failed to consider" important factors in reaching its determination. *State Farm*, 463 U.S. at 43; *see Joslyn*, 110 Fed. Cl. at 389. The Court finds that the Board failed to take into account certain factors that it should have considered pursuant to SECNAVINST 1850.4E in determining that Plaintiff could reasonably perform his duties and that, as shown by evidence in the record, were relevant to his case. Remand

would therefore be appropriate for the Board to reconsider its decision in light of these additional considerations, *see Nyan*, 154 Fed. Cl. at 467, but is ultimately unnecessary as explained below.[12]

**C.**     **The BCNR's Determination That Plaintiff's Separation for Misconduct Took Precedence Was Not Arbitrary and Capricious or Contrary to Law.**

Even though the BCNR's fitness determination was deficient for the reasons stated above, the shortcomings in its decision-making were not harmful or prejudicial.  *See Christian v. United States*, 337 F.3d 1338, 1343 (Fed. Cir. 2003) ("To recover back pay, it is not enough for the plaintiff to show merely that an error or injustice was committed in the administrative process," he must demonstrate "that the defect substantially affected the decision to separate him or relieve him from active duty . . . ." (quoting *Hary v. United States*, 618 F.2d 704, 707 (Ct. Cl. 1980))); *see also Wagner v. United States*, 365 F.3d 1358, 1365 (Fed. Cir. 2004).  That is because the BCNR found, regardless of Plaintiff's fitness or unfitness, that his "misconduct processing would have taken precedence" over disability processing.  AR 6; *see Fogo De Chao (Holdings), Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1149 (D.C. Cir. 2014) (holding that where an agency decision is based on multiple independent grounds a court can affirm the agency on APA review "so long as any one of the grounds is valid"); *see also Holmes v. United States*, 98 Fed. Cl. 767, 784–85 (2011) (upholding BCNR decision on one of its stated grounds where other stated ground

---

[12]     The Court does not find error in the Board failing to explicitly consider whether Plaintiff's impairments posed a risk to himself or others.  SECNAVINST 1850.4E states that a fitness determination "may" include an assessment of the risk posed to the welfare of the member, as well as other members due to the retention of a service member with a medical condition. SECNAVINST 1850.4E, encl. (3), ¶ 3302.b.  Thus, unlike deployability and special qualifications, the permissive language of the instruction leaves the performance of this risk assessment and its inclusion in a determination of a service member's fitness at the discretion of the relevant naval authorities charged with the responsibility of making the determination.  *See id.*  Although not required, however, the facts of some cases may warrant inclusion of the risk consideration, especially in cases of members who, like Navy Divers, perform particularly hazardous duties.

was erroneous).  The BCNR's decision on that point was neither arbitrary and capricious, nor contrary to law.

The Navy disability regulation in effect at the time of Plaintiff's separation mandated that "[p]rocessing for punitive discharge and processing for administrative discharge for misconduct takes precedence over processing for disability."  SECNAVINST 1850.4E, encl. (1), ¶ 1002.b; *see id.*, encl. (3), ¶ 3203.f.(6) ("The PEB will reject all cases in which the member is being processed for misconduct which could result in the member receiving either a punitive or administrative discharge due to that misconduct."); *see also Malcolm v. United States*, 752 F. App'x 973, 977 n.2 (Fed. Cir. 2018) (acknowledging that Navy disability regulations mandate misconduct processing takes precedence over disability processing).[13]  Plaintiff acknowledges the Board's finding that misconduct processing takes precedence over referrals to the DES system as "a correct statement of Navy policy in effect at the time of [Plaintiff's] separation."  ECF No. 10 at 20.  In that vein, Plaintiff concedes that the Board "adequately explained why there was no error in the initial denial of disability retirement."  *Id.* at 21.

Plaintiff, however, relies on a June 1, 2016 Memorandum from the Secretary of the Navy ("Dual Processing Memorandum") to argue that the Secretary has changed this policy and that the change should have prompted the BCNR to grant Plaintiff's request of disability retirement.  *See id.*; *see also* ECF No. 10-1 at 313–14 (Dual Processing Memorandum).  The Dual Processing

---

[13]  The Federal Circuit in *Malcom* noted that, despite the mandate, a plaintiff may be able to establish eligibility for benefits under SECNAVINST 1850.4E, encl. (3), ¶ 3414.b, which prohibits holding a service member responsible for his or her acts of misconduct if mental disease or defect caused the service member to be unable to appreciate the nature and quality of the wrongfulness of the acts.  752 F. App'x at 977 n.2.  Here, the Board "found no evidence that supported an argument [Plaintiff was] not criminally responsible for [his] misconduct and noted that there was no evidence presented in [his] civilian proceedings to indicate any mental incompetence."  AR 6.  Plaintiff does not challenge that finding in this action.

Memorandum allows service members, who have a ratable condition and are being processed for any type of involuntary administrative separation, to be referred to the DES.  ECF No. 10-1 at 313. The immediate effect of the Dual Processing Memorandum marked a noticeable shift in policy from the prior preclusion of such dual processing.  *See, e.g.*, SECNAVINST 1850.4E, encl. (3), ¶ 3203.f.(6).  Plaintiff argues that the Board's failure to consider the impact of the Dual Processing Memorandum on Plaintiff's case renders the Board's decision arbitrary and capricious and in violation of the BCNR's mandate to correct an injustice in a member's naval records.  ECF No. 10 at 21.

This argument suffers from both procedural and substantive flaws. First, as Defendant correctly notes, Plaintiff never raised an argument to the Board based on the existence of the Dual Processing Memorandum and its purported application to Plaintiff's case. *See* ECF No. 11 at 29; *see also* AR 12–22.  He could have.  The change in policy occurred in June 2016 and was publicized by July 2016, at the latest, several months before Plaintiff submitted his application to the Board.  *See* ECF No. 10-1 at 313, 315; *see also* AR 10.  Although Plaintiff contends that, "[i]n his response to the medical advisor's opinion, he specifically argued that his disabilities should take precedence over his misconduct separation," that argument was premised on his interpretation of ¶¶ 3106 and 3202.b of the applicable instruction (SECNAVINST 1850.4E), not any new or changed policy.  ECF No. 12 at 13–14 (citing AR 17); *see* AR 17.

As discussed above, the well-settled principle that arguments not raised before an administrative body cannot be first raised on judicial review applies equally to the review of military correction board decisions.  *See Metz*, 466 F.3d at 999; *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over

29

administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."). The "standard for assessing whether an issue was adequately raised before the administrative agency is that 'the issue must be raised with sufficient specificity and clarity that the tribunal is aware that it must decide the issue, and in sufficient time that the agency can do so.'" *Conant v. Off. of Pers. Mgmt.*, 255 F.3d 1371, 1375 (Fed. Cir. 2001) (quoting *Wallace v. Dep't of the Air Force*, 879 F.2d 829, 832 (Fed. Cir. 1989)).

Here, the record shows that an argument based on the Dual Processing Memorandum was not adequately raised to the BCNR. At best, Plaintiff's response to the CORB advisory opinion broached the subject of whether his misconduct should have precluded him from being referred to the PEB based on his disabilities, but it did not specifically or clearly argue that such question should be answered by application of a change in policy. Indeed, he supported the argument based on the application of the version of SECNAVINST 1850.4E in effect at the time, which expressly precluded dual processing. *See* AR 17. It cannot therefore be said that the BCNR should have been aware that it must decide the issue of whether the Dual Processing Memorandum applied to Plaintiff's case.[14] *See Conant*, 255 F.3d at 1375. Accordingly, the Court agrees with Defendant and finds Plaintiff has waived his argument premised on the Dual Processing Memorandum.

Second, the policy is facially inapplicable to Plaintiff because it contemplates application to "members *being processed* for any type of involuntary [administrative separation]." ECF No.

---

[14] For these reasons, the waiver analysis related to the Dual Processing Memorandum leads to a different conclusion than the analysis of Plaintiff's arguments regarding SECNAVINST 1850.4E considerations. The memorandum is not incorporated in any fashion in the Navy's disability regulation in effect at the time of Plaintiff's separation; indeed, it is contrary to it. Plaintiff's argument that the Dual Processing Memorandum applies retroactively to supplant the policy that was applicable to his separation is a "new" argument that should have first been raised to the BCNR to afford the Board an opportunity to evaluate the argument's merits. *See L.A. Tucker Truck Lines*, 344 U.S. at 37.

10-1 at 313 (emphasis added).  The language of the Dual Processing Memorandum indicates an immediate and prospective effect rather than any retroactive application.  As the Supreme Court has instructed, "[r]etroactivity is not favored in the law. . . . [A]nd administrative rules will not be construed to have retroactive effect unless their language requires this result."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (citing *Greene v. United States*, 376 U.S. 149, 160 (1964)).

Plaintiff argues that an article from "All Hands" supports retroactive application of the change in policy set forth in the Dual Processing Memorandum.  ECF No. 10 at 21.  The article states that "[a]ny service member previously separated under similar circumstances may petition to have their discharge reviewed through either the discharge review board or Board for Correction of Naval Records."  ECF No. 10-1 at 315.  There is no information in the record regarding the provenance of the article, except what is obvious from the printout submitted by Plaintiff.  *See id.* (indicating that the article was published by Defense Media Activity-Navy Production and written by a petty officer second class).  At the very least, it does not appear to be an official statement of the Office of the Secretary of the Navy, and thus has no binding effect.  *See Hamlet v. United States*, 63 F.3d 1097, 1103 (Fed. Cir. 1995); *see also Dunphy v. United States*, 208 Ct. Cl. 986, 989 (1975) (rejecting plaintiff's argument that an article in the Navy publication "All Hands" binds the Secretary of the Navy because the United States is not "bound by the unauthorized acts of its agents") (unpublished).  Nor is it persuasive evidence that the Dual Processing Memorandum can be interpreted to apply retroactively.  ECF No. 10-1 at 315.  The article characterizes the memorandum as being "[e]ffective immediately."  *Id.*  Its only reference to similarly situated service members who were previously separated (other than an explanation in bullet point number one of how the prior policy worked) states that such members may seek to have their discharges

31

administratively reviewed.  *Id.*  It does not make any representation that the Secretary or the review boards had determined that the Dual Processing Memorandum would be applied to members seeking such review.  *See id.*

Accordingly, the Court finds no error in the Board's denial of Plaintiff's application based on its application of the Navy instruction in effect at the time of his separation, which undisputedly made him ineligible for disability processing due to the precedence of his misconduct processing. Because the BCNR's decision can be upheld on that ground, any error in the Board's decision-making as to its fitness determination was harmless.

**D.      The BCNR's Finding of No Error or Injustice Warranting a Correction to Plaintiff's Record Was Not Arbitrary and Capricious and Did Not Violate Plaintiff's Due Process Rights.**

Plaintiff contends that the Board did not adequately explain why, in light of the NDRB's decision, there was no error or injustice in denying Plaintiff disability retirement.  ECF No. 10 at 21.  According to Plaintiff, the Board should have viewed the NDRB's decision "through the lens of [c]onstitutional due process requirements."  *Id.* at 22.  Specifically, Plaintiff argues that it was erroneous and unjust for the Board to rely on Plaintiff's misconduct processing to deny him disability retirement when the NDRB determined that Plaintiff's medical conditions (related to his duties as a Navy diver) contributed to his misconduct and thus justified upgrading his discharge characterization and changing his discharge narrative.  *Id.*  Defendant argues that Plaintiff's case involves no due process violation and that the Board adequately considered and rationally explained why the NDRB's decision supported the denial of Plaintiff's application.  *See* ECF No. 11 at 30–31; ECF No. 13 at 15–16.

The Due Process Clause of the Fifth Amendment prohibits a person from being "deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  "Due Process . .

. requires specific notice and an adequate opportunity to be heard prior to governmental decisions depriving individuals of liberty or property interests." *In re Bailey*, 182 F.3d 860, 871 (Fed. Cir. 1999) (citing *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976)); *see Cushman v. Shinseki*, 576 F.3d 1290, 1296 (Fed. Cir. 2009).

It is well established that the Court of Federal Claims lacks jurisdiction over claims alleging violations of the Due Process Clause because such clause is not a money-mandating provision. *See, e.g.*, *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995); *James v. Caldera*, 159 F.3d 573, 581 (Fed. Cir. 1998). When, however, a constitutional issue arises not as a standalone claim but as a factor to a claim of wrongful discharge of a service member, the Court may properly exercise jurisdiction. *See Holley v. United States*, 124 F.3d 1462, 1466 (Fed. Cir. 1997) ("The presence of a constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a properly brought claim under the Tucker Act, or bar the court from considering the constitutional issue in the course of determining whether the discharge was wrongful."). Here, Plaintiff's allegations fall into the latter category. Therefore, the Court may properly consider any alleged due process violations as part of its broader inquiry into the propriety of the BCNR's decision-making process. *See id*.

"To raise a due process question, the claimant must demonstrate a property interest entitled to such protections." *Cushman*, 576 F.3d at 1296 (citing *Richard v. West*, 161 F.3d 719, 723 (Fed. Cir. 1998)); *see Stone v. Fed. Deposit Ins. Corp.*, 179 F.3d 1368, 1374 (Fed. Cir. 1999) ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972))). Defendant argues that Plaintiff fails to demonstrate that his separation amounted to a deprivation

of a property interest triggering due process protections.  ECF No. 13 at 15.  Instead, as Defendant

asserts, service members possess no right to remain on active duty.  *See id.* (citing, *inter alia*, *Deese*

*v. Esper*, 483 F. Supp. 3d 290, 315 (D. Md. 2020) ("Military service members do not have a

property interest in their term of enlistment, attendance in military service academies, command

position, or officer status."); *Paskert v. United States*, 20 Cl. Ct. 65, 77 (1990) ("Service members

have no constitutional rights to remain on active duty, and their rights are defined by the applicable

statutes and regulations.")).  Defendant is correct.  "It is well settled . . . that a service member's

rights in matters related to pay, allowance, promotion, and demotion are grounded *solely* on

statutes and regulations."  *Crispino v. United States*, 3 Cl. Ct. 306, 313 (1983) (emphasis added)

(collecting cases).

Plaintiff's counsel asserted at oral argument that *Cushman* held that entitlement to military

disability benefits is a protectable property interest.  *Cushman*, however, involved the property

interest of a veteran-applicant for service-connected disability benefits.  *See* 576 F.3d at 1297–98.

Military disability retirement benefits and veteran disability benefits are derived from wholly

distinct statutory schemes.  *See Russell v. United States*, 102 Fed. Cl. 9, 17 (2011).  This Court

will not find that same property interest to include military disability benefits in light of established

precedent.  *See, e.g.*, *Paskert*, 20 Cl. Ct. at 77 (noting military regulations "were designed

specifically to give members of the military a useable administrative process by which to present

their claims without the entanglements of an entire due process structure").  Accordingly, Plaintiff

cannot claim the Board's decision violated his due process rights because Plaintiff lacked a

recognized property interest in the first instance.  *See id.*

Moreover, it is clear the Board considered the NDRB's decision and rationally explained

its effect on the Board's determination.  The BCNR stated its agreement with the NDRB's

conclusion that Plaintiff was "properly processed and discharged . . . for misconduct" at the time

of his separation.  AR 6; *see id.* at 139 (explaining the NDRB's finding that Plaintiff's discharge

"was proper and equitable at the time of discharge").  Just as the NDRB, the Board also found no

evidence to suggest that Plaintiff was not criminally responsible for his misconduct or was

mentally incompetent.  *Id.* at 6; *see id.* at 138 (explaining the NDRB's finding that Plaintiff's

misconduct stemmed from "conscious decisions that violate the tenants of honorable and faithful

service").  Based on these findings, the Board concluded that the misconduct-precedence policy

properly applied to Plaintiff and, as a result, he was ineligible for disability retirement.  *Id.* at 6.

  Such findings are not inconsistent with, nor do they deprive Plaintiff of the benefit of, the

NDRB's decision to change his discharge characterization and narrative reason.  Although the

BCNR and the NDRB are both naval administrative bodies responsible for reviewing Navy

discharge or dismissal actions, they do not operate under equivalent mandates.  *See Vietnam*

*Veterans of Am. v. Sec'y of Navy*, 843 F.2d 528, 531 (D.C. Cir. 1988).  The NDRB, consisting of

five Navy officers, reviews discharge actions "to examine the propriety and equity of the

applicant's discharge" and has the authority to reclassify a discharge where necessary.  *Lefrancois*

*v. Mabus*, 910 F. Supp. 2d 12, 15 (D.D.C. 2012) (quoting SECNAVINST 5420.174D, encl. (5),

§ 501a (Dec. 22, 2004)); *see* 10 U.S.C. §§ 1553(a), (b)(1).  Unlike the NDRB, the BCNR is staffed

by civilians and is charged with "correct[ing] any Navy record when 'necessary to correct an error

or remove an injustice.'"  *Vietnam Veterans*, 843 F.2d at 531 (quoting 10 U.S.C. § 1552(a)).  The

BCNR's mandate "has been viewed as broader than that of the NDRB."  *Id.* (citing *Strang v.*

*Marsh*, 602 F. Supp. 1565, 1570 (D.R.I. 1985)).  Accordingly, a decision by the NDRB to afford

relief based on considerations of equity does not require the Board to find that those same

considerations result in error or injustice warranting a correction of records.  Indeed, the NDRB

found no error or inequities with Plaintiff's discharge at the time.  AR 139.  Whether post-separation circumstances rose to the level of "injustice" in Plaintiff's case was a decision within the Board's broad discretion to make.  *See Murphy v. United States*, 993 F.2d 871, 874 (Fed. Cir. 1993) (citing *Grieg v. United States*, 640 F.2d 1261, 1265 (Ct. Cl. 1981)).  Here, the Court finds nothing arbitrary or capricious about the Board's consideration or explanation of the NDRB's decision.

### III.  CONCLUSION

For the above stated reasons, Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 9) is hereby **DENIED**, and Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 11) is **GRANTED**.  The Clerk is directed to enter judgment accordingly.

**SO ORDERED**.

Dated: November 19, 2021                                        */s/ Kathryn C. Davis*
                                                             KATHRYN C. DAVIS
                                                             Judge