## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| ───────────────────────── | ) | |
| MATTHEW R. KELLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 20-579 |
| | ) | |
| THE UNITED STATES, | ) | Filed: October 20, 2025 |
| | ) | |
| Defendant. | ) | |
| ───────────────────────── | ) | |

## OPINION AND ORDER

Plaintiff Matthew Kelly is a former Navy diver. He was discharged for misconduct on December 20, 2013, and subsequently applied to the Board for Correction of Naval Records ("BCNR" or "Board"), requesting that it correct his records to reflect a disability retirement. The Board denied his request, and this Court sustained the denial. The matter is before the Court again following a remand consistent with the instructions of the United States Court of Appeals for the Federal Circuit, which vacated this Court's prior decision and directed further proceedings before the Board. On remand, the Board again denied Mr. Kelly's request for relief. Similar to its original denial, the Board held that there was no error or injustice in Mr. Kelly's discharge for misconduct; thus, he was ineligible for processing through the Navy's Disability Evaluation System ("DES"). The Board further found that, regardless, Mr. Kelly did not present sufficient evidence to show that he should have been referred to the DES or that, if he had been referred, the Physical Evaluation Board ("PEB") would have found him unfit under the relevant considerations set out in Secretary of the Navy Instruction ("SECNAVINST") 1850.4E. Mr. Kelly now challenges that denial.

Before the Court is Mr. Kelly's renewed Motion for Judgment on the Administrative Record and the Government's Cross-Motion for Judgment on the Administrative Record, as well as Mr. Kelly's post-argument Motion to Supplement the Administrative Record. For the reasons explained below, the Court **GRANTS** the Government's Cross-Motion and **DENIES** Mr. Kelly's dispositive and procedural motions.

## I. BACKGROUND

### A. Factual and Procedural Background

This opinion assumes the reader's familiarity with the Court's prior decision in this case, which provided a fulsome factual and procedural background up to the date of the opinion. *See Kelly v. United States* (*Kelly I*), 157 Fed. Cl. 114, 118–23 (2021). In that decision, the Court held that the Board failed to consider certain criteria under SECNAVINST 1850.4E in determining Mr. Kelly's fitness. *Id.* at 125–28. Most importantly, the BCNR failed to connect its review of Mr. Kelly's ability to perform his duties with a consideration of the common military tasks that he was reasonably expected to perform as a Second Class Navy Diver. *See id.*; *see also* Department of Navy (DON) Disability Evaluation Manual, SECNAVINST 1850.4E, encl. (3), ¶¶ 3301, 3304.a.(1) (Apr. 30, 2002). Instead, it relied exclusively on Mr. Kelly's last two, mostly positive performance reviews despite that neither review provided much information about the specific duties Mr. Kelly was performing and, with respect to the final review, covered a period when he was largely performing the duties of a maintenance technician. *Kelly I*, 157 Fed. Cl. at 127–28. The Court found remand would be appropriate for the Board to reconsider its decision. *Id.* at 130.

Nonetheless, the Court held that the Board's deficient analysis was harmless because the Board correctly concluded that Mr. Kelly's discharge for misconduct took precedence over disability processing. *See id.* at 130–33. The Court likewise rejected Mr. Kelly's argument that

the Board violated his due process rights by relying on his misconduct discharge to deny relief where he had successfully petitioned the Naval Discharge Review Board ("NDRB") to change his discharge characterization from "under honorable" to "honorable" and narrative reason from "misconduct" to "Secretarial Authority" based on equitable grounds. *See id.* at 134–35.

On appeal, the Federal Circuit vacated and remanded to this Court with instructions to remand to the BCNR. *See Kelly v. United States* (*Kelly II*), 69 F.4th 887, 900 (Fed. Cir. 2023). The Federal Circuit agreed with this Court's holding that the Board improperly based its fitness determination solely on Mr. Kelly's final two performance evaluations and that it therefore failed to consider all relevant criteria enumerated in SECNAVINST 1850.4E, encl. (3), ¶ 3304. *Id.* at 896. It also agreed that remand to the Board for a full evaluation of the criteria in the first instance was the appropriate remedy. *Id.*; *see Kelly I*, 157 Fed. Cl. at 130.

However, the Circuit disagreed with this Court's conclusion that Mr. Kelly's separation for misconduct precluded him from referral to the DES and by extension a potential disability retirement. *Kelly II*, 69 F.4th at 896–98 (citing *Kelly I*, 157 Fed. Cl. at 124–30). The Circuit held that the Board failed to "adequately discuss or explain why it continued to treat Mr. Kelly's record as containing a separation for misconduct" when the NDRB had, by the time of Mr. Kelly's BCNR application, upgraded his characterization to honorable and removed misconduct from the narrative reason for his discharge. *Id.* at 899; *see id.* at 898. It held that the BCNR's "failure to review or evaluate the effect the upgrade change in Mr. Kelly's record had on his eligibility for military retirement disability pay was arbitrary and capricious." *Id.* at 899. Although the Circuit did not expressly answer the question itself, it did discuss with approval *LaBonte v. United States*, 43 F.4th 1357 (Fed. Cir. 2022), in which the Federal Circuit found no error in the trial court's finding that a clemency decision removed the plaintiff's ineligibility for disability retirement.

*Kelly II*, 69 F.4th at 897–98 (noting that "*LaBonte* is instructive" (footnote omitted)).  The Circuit also discussed Veterans Administration ("VA") regulations that treat changes in discharge characterization as removing a prior bar to receiving veterans disability benefits.  *See id.* at 899 (acknowledging that "VA regulations and VA decisions concerning disability are not binding on matters involving military disability retirement pay," but finding "no principled reason" for the Navy to treat changes in discharge characterization differently).

Accordingly, the Circuit remanded for the Board to "explain, in the first instance, its determination in this case in view of Mr. Kelly's change in discharge characterization and narrative reason for separation, to determine Mr. Kelly's fitness under all relevant considerations set out in SECNAVINST 1850.4E § 3304, and to address Mr. Kelly's eligibility under the relevant military disability retirement pay statute, 10 U.S.C. §§ 1201, 1203."  *Id.* at 900–01.  Consistent with those instructions, this Court remanded the case to the BCNR on September 22, 2023, instructing the Board to:

> (a) Explain, in the first instance, the BCNR's determination in this case in view of Plaintiff's change in discharge characterization and narrative reason for separation;
>
> (b) Determine Plaintiff's fitness under all relevant considerations set out in [SECNAVINST] 1850.4E § 3304;
>
> (c) Address Plaintiff's eligibility for military disability benefits under 10 U.S.C. §§ 1201, 1203; and
>
> (d) Consider any additional argument or evidence regarding Plaintiff's claim for military disability benefits that Plaintiff submits to the BCNR within 45 days of the date of [the Remand] Order.

Remand Order at 1–2, ECF No. 24.

### B.     The BCNR's Remand Decision

On May 28, 2024, the Board issued its decision on remand.  Admin. R. ("AR") 538–71,

ECF Nos. 8, 31.[1]  In accordance with the remand order, the Board considered Mr. Kelly's case de

novo and, in a 34-page decision, again denied Mr. Kelly's request to correct his records to reflect

a disability retirement.  *See id.*  At the outset of its decision, the Board acknowledged Mr. Kelly's

"additional arguments and evidence submitted in accordance with [this Court's] remand order,"

listing out the arguments by bullet point.  AR 552.  The Board determined that an in-person

appearance by Mr. Kelly would not materially add to its understanding of the issues and therefore

declined to hold a personal hearing.  AR 539.

In addressing Mr. Kelly's eligibility for disability processing, "[t]he Board found no

evidence of any material error or injustice in [Mr. Kelly's] discharge for misconduct."  AR 554.

It further found that the NDRB's equitable upgrade of Mr. Kelly's discharge characterization and

narrative reason had "no bearing on [his] eligibility for disability processing because the NDRB's

action was based upon equity rather than impropriety."  AR 561.  As the BCNR noted, the NDRB

"rejected each of [Mr. Kelly's] eight claims of impropriety, but [it] granted relief on solely

equitable grounds based primarily upon its finding that [his] service-connected cognitive defects

contributed to [his] performance decline and misconduct," that he performed "relatively dangerous

duties," and that "the entirety of [his] service was otherwise meritorious."  AR 561–62.  Because

the upgrade was granted "on purely equitable grounds," the Board held that the upgrade "[did] not

negate" the fact that Mr. Kelly was correctly separated for misconduct and thus was ineligible for

---

[1] For ease of reference, citations to the Administrative Record refer to the bates-labeled page numbers rather than the ECF page numbers.  The originally filed Administrative Record includes pages 1–537 (ECF No. 8), and the supplement to the record created on remand includes pages 528–1281 (ECF No. 31).  The Court will collectively refer to all parts as the Administrative Record or "AR."

disability processing at the time of his discharge.  AR 562.  As support for its conclusion, the BCNR cited a 2018 policy document issued by then-Under Secretary of Defense Robert L. Wilkie ("Wilkie Memo"), which advised that "changes to the narrative reason for a discharge and/or an upgraded character of discharge *granted solely on equity grounds* should not normally result in eligibility for financial benefits."  *Id.* (emphasis in original).

The Board "noted the [Federal Circuit's] commentary that the Board's treatment of a change to the characterization of service is different than the VA's treatment of such changes, and that [the Court] could 'see no principled reason for such disparate treatment in how the Navy treats changes in discharge characterization,'" but the Board "respectfully disagreed with" the Circuit on this point.  *Id.* (quoting *Kelly II*, 69 F.4th at 899).  It explained that "[u]nlike VA disability benefits, eligibility for military disability retirement benefits is not tied to the individual's characterization of service.  Rather, it was the fact that [Mr. Kelly was] being administratively processed for separation due to misconduct which disqualified [him] for disability processing in 2013," a policy which "existed, at least in part, to promote good order and discipline in the Navy and Marine Corps."  *Id.*  The Board also stated its belief that "the [Federal Circuit's] comment in this regard reflected [the Court's] misunderstanding of the function of th[e] Board."  *Id.*

Next, the Board assessed relevant evidence of Mr. Kelly's fitness under the factors in SECNAVINST 1850.4E, encl. (3), ¶ 3304: common military tasks, physical readiness or fitness tests, deployability, and special qualifications.[2]  With an emphasis on diving duties, the Board found that Mr. Kelly was performing his common military tasks "right up until the time that [his]

---

[2] Although the Board balked at having to perform what it considered "a function outside of its purview," AR 566, binding precedent—as the Government agrees—holds that the BCNR is a competent tribunal to make disability determinations in the first instance.  *See* Def.'s Cross-Mot. for J. on Admin. R. at 44–45, ECF No. 37 (citing *Chambers v. United States*, 417 F.3d 1218, 1225 (Fed. Cir. 2005); *Sawyer v. United States*, 930 F.2d 1577, 1581 (Fed. Cir. 1991)).

diving duties were suspended in April 2013, and that [his] physical abilities did not change after that suspension." AR 566.  It found that Mr. Kelly's cognitive deficits began to manifest soon after his decompression sickness incident in 2012 and that he exhibited symptoms of depression as early as 2012, yet he "continued to dive and dive well," as reflected by his performance evaluations for October 30, 2012, to March 15, 2013, and March 16, 2013, to May 13, 2013. *Id.* These evaluations reflected that Mr. Kelly was "actively performing diving duties at or above standards." AR 567.

The Board acknowledged that the Navy suspended Mr. Kelly's diving privileges after his alcohol-related misconduct in April 2013 pursuant to article 15-102 of the Navy Manual of the Medical Department ("MANMED").[3] *Id.*  It described the MANMED, however, as providing "regulatory restrictions," not medical restrictions or physical disabilities. *Id.*; AR 541.  The Board found "no evidence in the record" that Mr. Kelly was "physically unable to" perform diving duties. AR 567.  It added that since referral to the DES is typically premised on a medical provider determining "that there is some question regarding [a service member's] ability to perform" his or her duties, "the fact that no medical or mental health provider ever so referred" Mr. Kelly is "compelling evidence that" he was "capable of performing those duties." *Id.*  It also placed weight on the fact that Mr. Kelly took a diving job with the National Park Service after leaving the Navy. *Id.*

---

[3] The Board assumed that the suspension was based on MANMED, article 15-102, ¶ 7(k)(2), but it did not explain the facts underlying the assumption. AR 543 n.21.  Article 15-102 of the MANMED, paragraph 7(k)(2), provides that an "alcohol incident will result in disqualification from diving duty until all recommended treatment or courses mandated by the member's current commanding officer and/or [a substance abuse rehabilitation program] have been fully completed." *Id.*; *see* AR 634.  The alcohol incident at issue here was Mr. Kelly's arrest on April 14, 2013, for driving while intoxicated, among other offenses. AR 543.

While the Board recognized that Mr. Kelly had two Traumatic Brain Injury ("TBI") incidents, it found that they "were very minor and rendered no residual effect." *Id.* It also noted, based on Mr. Kelly's assessment at the Hampton Roads Neuropsychology Clinic, that he was diagnosed with only a mild neurocognitive disorder. *Id.* There was, however, one medical record dated December 9, 2013, from the Defense Health Agency Neurorehabilitation and Traumatic Brain Injury National Intrepid Center of Excellence that the Board found could weigh in favor of unfitness based on a notation alluding to the "possibility that continued diving may have represented a risk to [Mr. Kelly's] health." AR 568. The report at issue stated that a cyst in Mr. Kelly's brain was potentially "one source of the difficulties given the changes in pressure that a diver endures." *Id.* But the Board ultimately found there was insufficient evidence that "continued diving with the cyst represented 'a decided medical risk'" beyond "mere speculation." *Id.*

Furthermore, the Board found no evidence that Mr. Kelly's medical conditions impaired his ability to perform any physical readiness or fitness tests, as his performance evaluations reflect that he "routinely participated in and passed" the Physical Fitness Assessment. AR 569. It also found no evidence that his conditions rendered him non-deployable because no trained Department of Defense ("DoD") healthcare provider ever determined he was non-deployable. AR 570 (citing Deployment-Limiting Medical Conditions for Service Members and DoD Civilian Employees, DoD Instruction ("DoDI") 6490.07, encl. (2), ¶ 2 (Feb. 5, 2010)). Given that DoD guidelines identify certain mental health disorders as potentially non-deployable, the Board conceded the possibility that Mr. Kelly's mental health conditions may have met the criteria of non-deployability. *Id.* (citing DoDI 6490.07, encl. (3), ¶ (h)). It found, however, that Mr. Kelly provided no other evidence to establish that his conditions met the criteria. *Id.* Finally, the Board noted that no medical condition caused Mr. Kelly to lose any special qualification because his

diving privileges were temporarily suspended and then revoked due to misconduct rather than any physical or mental health disorder. *Id.*

The Board concluded by addressing Mr. Kelly's eligibility for disability benefits under 10 U.S.C. §§ 1201 and 1203, stating that it found no "error or injustice in the fact that [he is] currently ineligible for medical retirement benefits." AR 571.

### C.    This Litigation

Following the BCNR's decision on remand, and consistent with the Court's scheduling order, ECF No. 30, the Government supplemented the Administrative Record on July 26, 2024. *See* ECF No. 31. The parties then filed renewed Motions for Judgment on the Administrative Record. *See* Pl.'s Mot. for J. on Admin. R., ECF No. 34; Def.'s Cross-Mot. for J. on Admin. R., ECF No. 37. In capsule form, Mr. Kelly argues that: (1) because the Board incorrectly professed incompetence to decide unfitness, the matter should be remanded with instructions to refer his case to a PEB; (2) due process required the Board to give him a personal hearing; (3) the Board erroneously determined he was ineligible for a disability retirement based on misconduct; and (4) its fitness determination was both incorrect and inadequately explained.[4] *See* ECF No. 34-1 at 17–19, 33; Pl.'s Reply & Resp. to Def.'s Cross-Mot. at 23, ECF No. 38. The Government disputes each of these claims, contending that: (1) the Board considered all relevant factors, including those required by the remand instructions; (2) the Board reasonably found Mr. Kelly was ineligible for

---

[4] Mr. Kelly filed four notices attaching additional exhibits. *See* Notice Transmitting Ex., ECF No. 39 (Navy Enlisted Occupational Standards for a Navy Diver); Notice, ECF No. 43 (documents related to the dual processing policy change); Notice Transmitting Ex., ECF No. 44 (BCNR Decision in Another Case); Notice Transmitting Ex., ECF No. 46 (Freedom of Information Act response). Mr. Kelly filed the first notice after he submitted his final brief, and he filed the remaining three notices after all briefing was complete. While Mr. Kelly later moved to supplement the administrative record with other Freedom of Information Act materials, Mr. Kelly never moved to supplement the administrative record with the materials attached to these four notices.

disability processing due to his separation for misconduct and reasonably found that the NDRB's equitable upgrade did not alter this conclusion; (3) the Board reasonably found Mr. Kelly did not demonstrate unfitness; and (4) due process did not require a personal hearing before the Board. *See* ECF No. 37 at 23, 43, 45, 46, 53; Def.'s Reply, ECF No. 42. The dispositive motions are now fully briefed. The Court held oral argument on May 6, 2025.

Following oral argument, Mr. Kelly filed a Motion to Supplement the Administrative Record with (1) a Freedom of Information Act ("FOIA") request he submitted to the BCNR seeking evidence that the Board's panel members approved the written decision issued on remand, (2) the Board's response stating that it had no such documents, and (3) correspondence between Mr. Kelly's counsel and the Government's counsel concerning Mr. Kelly's plan to file the motion. *See* Pl.'s Mot. to Suppl. R. at 1–2, ECF No. 50. The Government argued in its response that the proposed supplement was untimely, attempts to raise new arguments, and in any event is not necessary for effective judicial review. *See* Def.'s Resp. to Pl.'s Mot. to Suppl. R. at 2–4, ECF No. 51. Plaintiff did not file a reply, and thus the motion is fully briefed and ready for decision.

## II.   LEGAL STANDARDS

### A.    Motions for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims governs motions for judgment on the administrative record. Such motions essentially call for "an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). Unlike proceedings for summary judgment, the standard for judgment on the administrative record involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [challenged action or] decision was not in accordance with the law." *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*,

404 F.3d at 1357).  Therefore, a genuine issue of disputed fact does not prevent the Court from granting a motion for judgment on the administrative record.  *See Bannum*, 404 F.3d at 1357.

### B.    Standard of Review

When reviewing a correction board decision, the Court applies the Administrative Procedure Act ("APA") standard of review.  *Faerber v. United States*, 169 Fed. Cl. 391, 396 (2024) (citing *Sharpe v. United States*, 935 F.3d 1352, 1358 (Fed. Cir. 2019)); *see Walls v. United States*, 582 F.3d 1358, 1367–68, 1367 n.11 (Fed. Cir. 2009) (explaining that a correction board's decision is reviewed "under the same standard as any other agency action" (citation omitted)).  Thus, this Court's review is limited to assessing whether the Board's conclusions were "arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law." *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983) (quoting *Clayton v. United States*, 225 Ct. Cl. 593, 595 (1980)); *see Barnes v. United States*, 473 F.3d 1356, 1361 (Fed. Cir. 2007).  Under the arbitrary and capricious standard, the Court "will not vacate an agency's decision unless it 'has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a [different view] or [agency expertise].'" *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (citation omitted).  Because the scope of judicial review is "narrow," the Court assesses "only whether [the agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Sharpe*, 935 F.3d at 1358 (alteration in original) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019)).

When reviewing agency action, the Government is entitled to a "strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties

correctly, lawfully, and in good faith." *Doe v. United States*, 132 F.3d 1430, 1434 (Fed. Cir. 1997) (quoting *Sanders v. United States*, 219 Ct. Cl. 285, 302 (1979)). This standard is especially deferential in cases "pertaining to the military and national defense." *Voge v. United States*, 844 F.2d 776, 779 (Fed. Cir. 1988) (citing *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981)). As such, the Court may not "substitute [its] judgment for that of [the agency], but instead must confine [itself] to ensuring that [the agency] remained within the bounds of reasoned decisionmaking." *Sharpe*, 935 F.3d at 1358 (quoting *Dep't of Com.*, 588 U.S. at 773 (internal quotation marks omitted)).

Moreover, even if the plaintiff identifies an error in the administrative proceedings, he "still would have to establish that the error was prejudicial, i.e., that it affected the [agency's] ultimate conclusion[.]" *Fisher v. United States*, 81 Fed. Cl. 155, 158–59 (2008) (citation omitted), *aff'd*, No. 2008-5094, 2010 WL 4009437 (Fed. Cir. Oct. 14, 2010).

## C.    Motions to Supplement the Administrative Record

In APA-review cases, parties have a "limited" ability to supplement the record. *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009). This is because "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Id.* (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). Thus, the record "should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA." *Id.* at 1381. Courts have thus found supplementation appropriate where the supplemental material is "necessary to help explain an agency's decision," *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343 (2004) (citing *Camp*, 411 U.S. at 142–43); helps explain what the decisionmaker considered in reaching a decision, *Precision Standard, Inc. v. United States*, 69 Fed. Cl. 738, 747 (2006), *aff'd*, 228 F. App'x 980 (Fed. Cir. 2007); or "correct[s] mistakes and fill[s] gaps" in the administrative record, *Pinnacle*

*Sols., Inc. v. United States*, 137 Fed. Cl. 118, 130 (2018) (citing *Axiom*, 564 F.3d at 1379–81; *L-3 Commc'ns EOTech, Inc. v. United States*, 87 Fed. Cl. 656, 672 (2009)).

## III.  DISCUSSION

The BCNR's remand decision denied relief on two grounds: the precedence of Mr. Kelly's separation for misconduct over disability processing and his failure to show that he was unfit for continued service at the time of discharge.  Mr. Kelly challenges both conclusions, but his motion can be resolved on narrower grounds.[5]  Even if the Board improperly determined that there was no error or injustice in his misconduct separation and that the equitable relief afforded by the NDRB had no impact on his ineligibility for disability retirement, Mr. Kelly fails to show that the Board's conclusion regarding fitness was arbitrary and capricious or contrary to law.  Consistent with the instructions of the Federal Circuit and this Court, the Board considered all relevant factors and rationally concluded that Mr. Kelly had not shown he was unfit.  Additionally, due process did not require the Board to provide Mr. Kelly an in-person hearing.  Finally, Mr. Kelly's Motion to Supplement is both untimely and without merit.

### A.    The Board Considered All Relevant Factors.

Mr. Kelly argues that the Board failed to determine Mr. Kelly's fitness under all relevant considerations set out in SECNAVINST 1850.4E, encl. (3), ¶ 3304.  Specifically, he asserts that the Board: (i) did not identify his common military tasks pursuant to SECNAVINST 1850.4E,

---

[5] Because the decision is sustainable based on the Board's fitness determination, this opinion does not review the Board's separate, independent conclusion that Mr. Kelly is ineligible for disability retirement based on his separation for misconduct.  *See Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1149 (D.C. Cir. 2014) ("[W]e will affirm the agency so long as any one of the grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable." (quoting *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1183 (D.C. Cir. 2003)); *see also Harmonia Holdings Grp., LLC v. United States*, 160 Fed. Cl. 674, 689 (2022) (citing *Fogo De Chao*, 769 F.3d at 1149).

encl. (3), ¶ 3304.a.(1), ECF No. 34-1 at 33; (ii) failed to recognize Mr. Kelly's proof of non-deployability as required by ¶ 3304.a.(3), *id.* at 37; (iii) failed to apply the MANMED's diving restrictions to assess both Mr. Kelly's ability to perform his common military tasks and the special qualifications criterion of ¶ 3304.a.(4), *id.* at 38; and (iv) did not "consider the combined effect of [his] major depressive disorder and cognitive impairments on his fitness" consistent with ¶ 3304.d, *id.* Mr. Kelly also asserts that the Board ignored other important aspects of his fitness determination in that it "failed to inquire into whether [his] impairments might pose a risk to other service members" as required by ¶ 3302.b.(1), *id.* at 37; failed to apply the screening criteria in Enclosure 8 of SECNAVINST 1850.4E to decide whether to refer his case to a PEB, *id.* at 40; and failed to address the impact of the liberal consideration policy discussed in a recent DoD guidance memorandum issued by Ashish S. Vazirani, then-Acting Under Secretary of Defense, Personnel and Readiness ("Vazirani Memo"), Oral Arg. Tr. at 7:9–23, ECF No. 48.

As an initial matter, although Mr. Kelly's counsel attempted at oral argument to frame these objections as a matter of the Board ignoring certain criteria or evidence, some of Mr. Kelly's arguments are more properly characterized as challenges to the merits of the Board's conclusions.[6] Accordingly, the Court will discuss the Board's findings on deployability, the MANMED diving restrictions, and Enclosure 8—all of which the Board plainly considered—when reviewing whether the BCNR's fitness determination was rational and supported by record evidence. Regardless of the nature of the challenge, however, each ground fails.

---

[6] Counsel candidly explained the strategy behind his framing of the issues. *See* ECF No. 48 at 30:9–31:25.

1.    <u>The Board Considered All Remand Criteria.</u>

The Board's remand decision sufficiently responded to the Court's remand instructions by determining Mr. Kelly's fitness under the criteria of SECNAVINST 1850.4E, encl. (3), ¶ 3304. First, the Board identified and assessed Mr. Kelly's common military tasks. *See* SECNAVINST 1850.4E, encl. (3), ¶ 3304.a.(1).  Such analysis requires consideration of whether the "member, due to physical disability, is unable to reasonably perform the duties of his or her office, grade, rank, or rating." *Id.*  As the Court's prior decision explained, "SECNAVINST 1850.4E does not define the level of detail required by the common-military-task consideration.  However, the overall standard . . . requires 'relating the nature and degree of physical disability of the member to the requirements and duties that member may reasonably be expected to perform in his or her office, grade, rank, or rating.'"  *Kelly I*, 157 Fed. Cl. at 125 (emphasis omitted) (quoting SECNAVINST 1850.4E, encl. (3), ¶ 3301).  The Board's original decision did not meet that mark because it merely reviewed "whether [Mr. Kelly] was adequately performing duties—regardless of what those were—immediately before separation." *Id.*  Although the Board relied on Mr. Kelly's final two performance evaluations, it did not connect its analysis to the duties reasonably expected of Mr. Kelly as a Second Class Navy Diver. *Id.* at 125–27.  As Mr. Kelly represented to the BCNR on remand, his main duty as a Navy diver was diving. *See* AR 648 (Decl. of Matthew R. Kelly ¶ 2).

On remand, the Board properly considered whether Mr. Kelly was physically able to perform his diving duties.  The Board concluded that Mr. Kelly was "fully performing" his common military tasks "right up until the time that [his] *diving duties* were suspended."  AR 566 (emphasis added).  Even after he began experiencing mental health symptoms and cognitive deficits, the Board found that Mr. Kelly "continued to *dive* and *dive* well." *Id.* (emphasis added).

The Board cited Mr. Kelly's October 2012–March 2013 and March 2013–May 2013 performance evaluations for support, finding that the evaluations reflected the fact that he was "actively performing *diving duties* at or above standards" during that time.  AR 566–67 (emphasis added). It also reviewed Mr. Kelly's medical records and diagnoses, potentially adverse evidence such as the suspension of his diving privileges, and his post-discharge employment as a diver, in each instance connecting its analysis of the evidence to the question of Mr. Kelly's physical ability to dive.  *See* AR 567–68 (finding, for example, that Mr. Kelly's symptoms of major depressive disorder, which predated his formal diagnosis, "did not impair [his] ability to perform [his] diving duties").  There is thus no legitimate concern, unlike with the original decision, that the Board failed to consider Mr. Kelly's ability to perform what was admittedly his primary military task as a Navy diver.

Mr. Kelly contends that the Board should have analyzed whether he could perform deep-sea diving or other diving tasks (*e.g.*, salvage operations, force protection, working in hostile environments), not just any type of diving.  ECF No. 34-1 at 34.  The Board's consideration of Mr. Kelly's common military tasks, however, was not inadequate merely because it did not expressly reference deep-sea diving or specific diving missions.  Indeed, the thrust of the Board's analysis was that the evidence did not show a change in Mr. Kelly's physical ability to dive *at all* after he suffered incidents of TBI and decompression sickness and then began experiencing mental health issues and cognitive deficits.  *See* AR 566–68.  No medical provider who examined Mr. Kelly in relation to these incidents or symptoms recommended limited duties, such as limitations specific to the depth or nature of diving, or referred him to the DES.  *See* AR 567–68.  And the Board noted that the only reason Mr. Kelly stopped performing his diving duties altogether was due to the suspension and then removal of his diving privileges resulting from his misconduct issues.  *See*

AR 567, 568–69.  Given its conclusions, the Court does not see any error in the Board discussing Mr. Kelly's physical abilities in relation to general diving duties, as opposed to specifically discussing deep-sea diving.  The analysis and conclusions would necessarily be the same.

Next, the Board considered Mr. Kelly's ability to perform physical readiness/fitness tests. *See* SECNAVINST 1850.4E, encl. (3), ¶ 3304.a.(2).  It found that Mr. Kelly routinely participated in and passed the annual Physical Fitness Assessment.  AR 569.  The only fitness assessment Mr. Kelly missed was during the final testing cycle before his discharge, and he failed to participate only because he was receiving in-patient alcohol rehabilitation treatment.  *Id.*

The Board also addressed Mr. Kelly's deployability.  *See* SECNAVINST 1850.4E, encl. (3), ¶ 3304.a.(3).  It found that the record did not contain any determination that Mr. Kelly was non-deployable.  AR 570 (noting that "[a] trained DoD health-care provider must make a provisional determination on DD Form 2795 as to deployability of DoD personnel" (quoting DoDI 6490.07, encl. (2), ¶ 2)).  It also found that, although Mr. Kelly's mental health conditions could potentially have rendered him non-deployable, he did not provide any evidence to the Board establishing that it more than likely did.  AR 570 n.66 (summarizing a non-exhaustive list of mental health disorders that usually preclude deployment absent a waiver (citing DoDI 6490.07, encl. (3), ¶ h)).

Finally, the Board addressed Mr. Kelly's loss of his diving qualification to assess whether it supported a finding of unfitness.  *See* SECNAVINST 1850.4E, encl. (3), ¶ 3304.a.(4).  The Board found that the temporary suspension of Mr. Kelly's diving privileges resulted from his incident of alcohol-related misconduct in April 2013.  AR 567, 569; *see also* AR 543.  His diving credential was ultimately removed in September 2013 also due to misconduct.  AR 570.  Because the

suspension and removal were not due to physical disability, the Board concluded that the special qualifications criterion did not support a finding of unfitness.  AR 568, 570.

Mr. Kelly asserts that the Board failed to consider the combined effect of his major depressive disorder and cognitive impairments.  *See* ECF No. 34-1 at 38.  As the relevant naval instruction provides, a determination of unfitness can result from the "overall effect of two or more impairments even though each of them, standing alone, would not cause the [service] member to be referred into the DES or be found Unfit."  SECNAVINST 1850.4E, encl. (3), ¶ 3304.d.  Mr. Kelly, however, provides no citation to support his assertion that the Board ignored the instruction, and his own brief concedes that the Board did consider both his "cognitive disorder and major depression."  ECF No. 34-1 at 28 (citing AR 556–60).  Indeed, the Board explained that it "found sufficient evidence to conclude that [Mr. Kelly] developed cognitive deficits during [his] naval service," AR 558, and, immediately following that section, explained that it "found sufficient evidence to conclude that [he] suffered from [major depressive disorder] during [his] naval service," AR 560.  The Board went on to assess whether the nature and degree of both conditions prevented Mr. Kelly from reasonably performing his diving duties.  *See* AR 567–68.  There is no suggestion in the BCNR's remand decision that its analysis focused on each condition in isolation.  To the contrary, the Board acknowledged that Mr. Kelly exhibited signs of cognitive deficit *and* depression as early as 2012, but "continued to dive and dive well."  AR 566; *see also* AR 567–68 (collectively assessing the degree of Mr. Kelly's TBI incidents, cognitive deficiencies, and major depressive disorder).  Accordingly, the Court finds no indication that the Board failed to consider any combined effect of these conditions.

2.    The Board Did Not Entirely Fail to Consider Any Other Important Aspect of
the Problem.

Beyond the criteria set forth in SECNAVINST 1850.4E, encl. (3), ¶ 3304, Mr. Kelly claims

that the Board also failed to consider two important issues: (i) whether his impairments might have

posed a risk to other service members as provided in the permissive criteria set forth in

¶ 3302.b.(1), and (ii) the guidance on the liberal consideration policy set forth in the Vazirani

Memo.  As with the factors discussed above, Mr. Kelly has not shown that the BCNR's remand

decision should be set aside on these grounds.

As the Government correctly argues, the factors provided in ¶ 3302.b are permissive

considerations that a relevant naval authority responsible for making a fitness determination, in

this case the BCNR, *may* assess.  *See* ECF No. 37 at 53 (citing *Kelly I*, 157 Fed. Cl. at 130 n.12).

As relevant here, the instruction permits the authority to evaluate whether a service member's

"[m]edical condition represents a decided medical risk to the health of the member or to the welfare

of other members were the member to continue on active duty. . . ."  SECNAVINST 1850.4E,

encl. (3), ¶ 3302.b.(1).  Unlike the ¶ 3304 criteria, "the performance of this risk assessment and its

inclusion in a [fitness] determination" is left to the discretion of the relevant authority.  *Kelly I*,

157 Fed. Cl. at 130 n.12.  Neither the Federal Circuit's instructions, nor this Court's remand order,

specifically required the Board to consider ¶ 3302.b in determining Mr. Kelly's fitness.  Although

not required, the Board's decision indicates that that it did consider this provision.  The Board

stated that the "*only* factor that" it "found which might have weighed in favor of a finding of

unfitness due to [Mr. Kelly's] disability was the possibility that continued diving may have

represented a risk to [his] health" due to a cyst in his brain.  AR 568 (emphasis added).  Ultimately,

it determined that the cyst was not "a decided medical risk" and thus did not support a finding of

unfitness.  *Id.*  Mr. Kelly is correct that the Board's decision did not expressly conclude that Mr.

19

Kelly's condition also did not represent a risk to other members; however, that conclusion is reasonably implied. In discussing the risk assessment provided in ¶ 3302.b, the Board stated that the "only" factor that potentially suggested unfitness was the risk to Mr. Kelly's own health. *Id.* If that was the only issue that gave the Board pause, then necessarily the risk-to-others issue did not.

Mr. Kelly similarly fails to show that the Board erred by not discussing the Vazirani Memo. The Vazirani Memo "provides clarifying guidance regarding the application of liberal consideration" in light of the Federal Circuit's decision in *Doyon v. United States*, 58 F.4th 1235 (Fed. Cir. 2023). ECF No. 42-1 at App. 16 (Ashish S. Vazirani, Clarifying Guidance to Boards for Correction of Military/Naval Records Considering Cases Involving Both Liberal Consideration Discharge Relief Requests and Fitness Determinations (Apr. 4, 2024)). Specifically, it states that, "[w]hile the [correction boards] are expected to apply liberal consideration to discharge relief requests seeking a change to the narrative reason for discharge," it "is DoD policy that the application of liberal consideration does not apply to fitness determinations, an entirely separate Military Department determination regarding whether, prior to [discharge], the Applicant was medically fit for military service (i.e., fitness determination)." *Id.* As Mr. Kelly correctly asserts, the Vazirani Memo creates or describes a two-step process for a service member who petitions a correction board to correct a military record to "establish eligibility for medical retirement or separation benefits pursuant to 10 U.S.C. § 1552" where he or she "alleges that combat- or military sexual trauma (MST)-related post-traumatic stress disorder (PTSD) or traumatic brain injury (TBI) 'potentially contributed to the circumstances resulting in [severance from military service].'" *Id.* (alteration in original) (quoting 10 U.S.C. § 1552(h)(2)(B)). Under step one, the correction board should apply liberal consideration to "determine whether any discharge relief, such as an upgrade

or change to the narrative reason for discharge, is appropriate." *Id.* It should then "separately assess the individual's claim of medical unfitness for continued service due to that PTSD or TBI condition . . . without applying liberal consideration to the unfitness claim." *Id.* at App. 16–17.

On one hand, Mr. Kelly embraces the Vazirani Memo's two-step procedure, arguing it proves that an equitable upgrade to a service member's discharge under step one, which would be based on the application of liberal consideration, does not preclude a correction board from considering at step two the member's eligibility for disability retirement. *See* ECF No. 48 at 10:11–12:3. On the other hand, Mr. Kelly also attacks the Vazirani Memo, arguing that it wrongly instructs boards to not apply liberal consideration to fitness determinations. *See id.* at 33:6–34:2. Mr. Kelly apparently claims that, had it considered the Memo on remand, the Board should have rejected DoD's policy in that respect and instead applied liberal consideration when determining whether he was fit for duty. *Id.* at 34:13–35:2.

Mr. Kelly did not raise any argument based on the Vazirani Memo in his renewed dispositive briefing, even though his counsel acknowledged at oral argument that he could have and should have raised it in the opening motion. *Id.* at 5:2–15 (noting that the Vazirani Memo was issued in April 2024, several weeks before the BCNR's remand decision). Accordingly, all the arguments grounded on the Vazirani Memo that counsel raised for the first time at oral argument are forfeited.[7] *See, e.g., DDR Holdings, LLC v. Priceline.com LLC*, 122 F.4th 911, 918 (Fed. Cir. 2024) ("'[o]ur law is well established that arguments not raised in the opening brief are [forfeited]'" (alterations in original) (quoting *SmithKline Beecham Corp. v. Apotex Corp.*, 439

---

[7] Even if not forfeited, because the Court need not address the BCNR's conclusions about the effect of the equitable relief granted by the NDRB on Mr. Kelly's ineligibility for disability benefits, it also need not address whether the Board's failure to consider the Vazirani Memo in such context warrants remand.

F.3d 1312, 1319 (Fed. Cir. 2006))); *United States v. Ford Motor Co.*, 463 F.3d 1267, 1276–77 (Fed. Cir. 2006) (citing *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)) (holding that arguments not raised in party's initial brief are not properly before the court); *Elec. Welfare Tr. Fund v. United States*, 167 Fed. Cl. 174, 179 (2023) ("[c]laims not presented in the complaint nor developed during briefing are properly deemed waived"); *Brooks Range Cont. Servs., Inc. v. United States*, 101 Fed. Cl. 699, 709 (2011) ("[b]y failing to raise the issue in its opening brief—here, plaintiff's motion for judgment on the administrative record—plaintiff has waived its right to assert [the argument] and may not later attempt to assert this challenge in subsequent briefing or at oral argument"); *see also In re Google Tech. Holdings LLC*, 980 F.3d 858, 862 (Fed. Cir. 2020) (distinguishing between doctrines of waiver and forfeiture and noting that courts frequently use the terms interchangeably).

*        *        *

In sum, based on the Court's review, the Board's remand decision properly considered all the factors required to be addressed on remand and did not ignore or fail to consider any other important aspects of Mr. Kelly's fitness determination.

### B.    The Board's Fitness Finding Was Not Arbitrary and Capricious or Contrary to Law and Does Not Lack Substantial Evidence.

At the outset, the parties agree that Mr. Kelly has the burden of proof at the Board, and Mr. Kelly conceded at oral argument that he must show, by a preponderance of evidence, entitlement to a correction of records. *See* ECF No. 37 at 37; ECF No. 48 at 29:23–24. Having considered all the relevant factors, the Board rationally explained its conclusion that Mr. Kelly failed to meet that burden both because of the lack of record evidence supporting a determination of unfitness and the ample record evidence supporting a fitness finding. That conclusion was neither arbitrary and

capricious, contrary to law, nor lacking in substantial evidence.  Accordingly, the Board's decision is affirmed on that ground.

First, the Board found Mr. Kelly's pre-discharge performance evaluations demonstrated that Mr. Kelly was "fully performing [his common military tasks] right up until the time that [his] diving duties were suspended in April 2013."  AR 566; *see Kelly I*, 157 Fed. Cl. at 125 ("[P]erformance evaluations are relevant evidence of the capacity of a member suffering from chronic medical impairments to perform duties reasonably expected of him or her." (citations omitted)).  This conclusion was based on a review of Mr. Kelly's evaluations for the periods covering October 2012–March 2013 and March 2013–May 2013.  AR 566.  Unlike in the original decision, the Board did not consider the evaluation covering the period of May 2013–December 2013, when Mr. Kelly was performing the duties of a maintenance technician and then was on temporary duty/leave at Ft. Belvoir Community Hospital for in-patient alcohol treatment.  *See Kelly I*, 157 Fed. Cl. at 126.

The Board found that the two evaluations it reviewed reflected that Mr. Kelly was actively performing both collateral duties and diving duties during these periods and doing so at or above standards.  *See* AR 567; *see also* AR 156–59.  As an example, the Government cites the October 2012–March 2013 evaluation, which characterized Mr. Kelly as a "motivated diver" who "[p]layed an essential role in salvage and recovery of eight Yard Patrol craft rub rails from Naval Support Activity, Annapolis basin, saving the Navy $8,000 in replacement costs."  ECF No. 37 at 49 (alteration in original) (quoting AR 159, 543).  The Court previously noted that this comment did not clearly establish what role Mr. Kelly played in this operation.  *See Kelly I*, 157 Fed. Cl. at 127 n.8.  Given the other evidence in the record, the Board's conclusion that the comment reflected Mr. Kelly's successful performance of a diving duty is reasonable.  *See, e.g.*, AR 215 (February

2013 medical record reporting that Mr. Kelly had "[n]o difficulty functioning at work – feel[s] the best when he's in the water diving").

In any event, Mr. Kelly does not challenge the Board's factual findings related to his performance evaluations; rather, he argues the evaluations are irrelevant because they pre-date his diagnoses. *See* ECF No. 34-1 at 34–35; ECF No. 38 at 28–29. The Court finds that the Board reasonably focused on the fact that Mr. Kelly's diving incidents and the subsequent manifestation of his symptoms occurred as early as 2012, before the evaluations at issue. AR 566; *see* AR 541–43 (summarizing chronology of TBIs, decompression sickness, and mental health treatment occurring before evaluations at issue); *see also* AR 648 (Kelly Decl. ¶¶ 3–4) (averring that after the 2012 decompression sickness event he had problems with attention, forgetfulness, fatigue, concentration, and emotional and behavioral changes). That Mr. Kelly could still successfully perform his diving duties after those incidents and symptoms appeared reasonably tends to support the conclusion that he was not unable to dive due to physical disability, even if no formal diagnosis of his conditions was made at that time. Accordingly, it was not irrational for the Board to consider this evidence.

Second, the Board concluded that the lack of any referral to the DES prior to his discharge also suggested that Mr. Kelly was capable of performing his duties. *See* AR 567. As the Board noted, military healthcare providers have a duty to identify and promptly refer to the DES any service member whose medical condition puts his or her fitness for duty in doubt. AR 563 (citing SECNAVINST 1850.4E, encl. (3), ¶ 3102.a). During the relevant period of Mr. Kelly's service, he was seen by numerous healthcare providers related to his TBIs, decompression sickness, mental health, alcohol-related misconduct, and ultimate separation. *See* AR 541–46. None of the providers recommended limited duty as a result of his conditions, let alone a disability evaluation.

AR 564.  Indeed, the Board highlighted affirmative statements in Mr. Kelly's medical records that tended to show he was physically capable of continuing to perform his diving duties notwithstanding those conditions.  *See id.* (discussing February 2013 record in which a provider commented that Mr. Kelly "had '[n]o difficulty functioning at work'" and "felt 'the best when [he was] in the water diving,'" as well as a medical record created nine days before discharge in which the provider highly recommended Mr. Kelly for continued service).  This included Mr. Kelly's Separation History and Physical Examination ("SHPE") dated December 19, 2013, in which a provider expressly found him qualified for service/separation.  AR 565.

Mr. Kelly argues that it was arbitrary and capricious for the Board to rely on the lack of a DES referral as evidence of his fitness.  ECF No. 34-1 at 35.  He further contends that it was irrational for the Board to disregard a statement in Mr. Kelly's SHPE indicating that Mr. Kelly's TBI incident and mental health conditions affected his capacity to continue diving, since that statement went directly to Mr. Kelly's ability to perform his common military tasks.  *Id.*  The Court agrees with Mr. Kelly that the absence of a DES referral does not in itself demonstrate fitness.  A correction board is a competent tribunal to first consider a service member's disability claim precisely because such member may not have "'had or sought a [PEB]'" before discharge.  *Chambers*, 417 F.3d at 1225 (quoting *Friedman*, 310 F.2d at 396).  But that does not mean that the lack of a DES referral is wholly irrelevant.  Here, the Board discussed numerous instances where Mr. Kelly was seen by military healthcare providers in real time concerning the medical conditions that underlie his disability claim, and no provider indicated any doubt about his fitness for duty.  That is relevant evidence.  Where the Board relied on this fact as only one of several facts supporting its fitness determination, the Court finds no error.

As for the statement in the SHPE, Mr. Kelly is also correct that an agency "cannot ignore evidence that undercuts its judgment." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018); *see* ECF No. 34-1 at 35.  In this instance, however, the Board did no such thing.  It cited the statement in the factual background section of the remand decision when discussing Mr. Kelly's SHPE.  *See* AR 545 ("This assessment noted that 'TBI, depression and anxiety disorder affect[ed your] capacity to continue diving.'" (alteration in original) (quoting AR 926)).  Although the Board did not further discuss the statement, a review of the examination report demonstrates that it does not undercut the Board's conclusion.  In context, the statement appears to record Mr. Kelly's belief (not the doctor's medical opinion) that his conditions affected his ability to continue diving.  *See* AR 926.  As the Government points out, the rest of the doctor's comments "in block 20 of the separation physical report all reflect information provided by Mr. Kelly"—for example, "[a]dmitted for inpatient detox for ETOH dependence," and "[h]e is concerned about continuity of care of his medical issues."  ECF No. 37 at 40; *see* AR 926.  Additionally, the number associated with the statement (#15) corresponds to block 15 on the previous page, where Mr. Kelly wrote "TBI, depression + anxiety order" in response to the question, "Do you have any conditions which currently limit your ability to work in your primary military specialty or require geographic or assignment limitations?"  AR 925 (capitalization omitted).  The doctor separately recorded Mr. Kelly's defects and diagnoses in block 77, including "depression, anxiety disorder, EtOH dependence, and neurological + cognitive impairment."  AR 927.  In that section, the doctor did not indicate that Mr. Kelly's medical conditions affected his physical ability to continue diving.  Instead, in block 74(a), he opined that Mr. Kelly was "qualified for service and separation."  *Id.* (capitalization omitted).  Accordingly, the statement Mr. Kelly points to does not show that the Board's reliance on the doctor's finding in the SHPE was irrational.

26

Third, the Board relied on the fact that after discharge Mr. Kelly took a job with the National Park Service as a diver at the Grand Canyon. *See* AR 567. A correction board's reliance on post-discharge employment to assess fitness is not unreasonable. *See O'Hare v. United States*, 155 Fed. Cl. 364, 376 (2021) (holding it was "not obviously unreasonable" to assume that the plaintiff's civilian emergency room responsibilities were "at least comparable to [the] medical care responsibilities of a hospital corpsman"). The fact that his civilian diving job did not involve deep-sea diving does not make his subsequent employment completely irrelevant, as Mr. Kelly contends. *See* ECF No. 34-1 at 34. The Board's remand decision did not suggest that Mr. Kelly's Grand Canyon diving responsibilities were identical to his Navy diving responsibilities; rather, they were similar enough to support the conclusion that Mr. Kelly continued to be able to perform his common military tasks despite his physical and mental health conditions. *See* AR 567; *see also* AR 705.

Moreover, while Mr. Kelly takes issue with the Board's characterization of this evidence as "dispositive," Mr. Kelly's post-discharge employment was not the only fact on which the Board based its determination. *See* ECF No. 34-1 at 34 (quoting AR 567). Even setting that fact aside, the remainder of the Board's discussion shows that it sufficiently considered Mr. Kelly's common military tasks and "relat[ed] the nature and degree of" Mr. Kelly's alleged physical disability to the "duties that [he] may reasonably [have been] expected to perform"—*i.e.*, diving. *Kelly I*, 157 Fed. Cl. at 125 (emphasis omitted) (quoting SECNAVINST 1850.4E, encl. (3), ¶ 3301); *see* AR 566–69.

Fourth, after concluding that Mr. Kelly's diagnosed conditions did not render him unable to perform his common military tasks due to physical disability and that his medical condition was overall improving after in-patient treatment in 2013, the Board turned its focus to Mr. Kelly's

argument based on the MANMED. *See* AR 568–69, 570. Contrary to Mr. Kelly's claim (ECF No. 34-1 at 38), the Board considered his MANMED argument in its analysis of both the common military tasks and special qualifications criteria of SECNAVINST 1850.4E, encl. (3), ¶ 3304. *See* AR 566–67, 568–69, 570. It held that the suspension and subsequent removal of Mr. Kelly's diving qualification were both related to misconduct, not due to his medical condition or his inability to perform his common military tasks due to disability. AR 569, 570. Accordingly, the Board found the loss of his diving qualification did not weigh in favor of finding unfitness, AR 570, and it characterized the diving standards set forth in the MANMED as irrelevant to the fitness analysis, AR 568–69 ("The diving standards of [the MANMED] do not constitute physical disabilities; they are regulatory restrictions."). Mr. Kelly disagrees, *see* ECF No. 34-1 at 38–39, but his argument is unavailing.

The Board reasonably determined that the loss of Mr. Kelly's diving qualification did not weigh in favor of finding him unfit. As the Court explained in its prior decision, per SECNAVINST 1850.4E, a fitness determination must include consideration of a service member's loss of special qualifications, which includes diving qualifications for Navy divers. *Kelly I*, 157 Fed. Cl. at 128 (citing SECNAVINST 1850.4E, encl. (3), ¶¶ 3304, 3307). Although the loss of special qualifications must be considered, like deployability, they are not to be used individually as a sole basis for determining the member's fitness. SECNAVINST 1850.4E, encl. (3), ¶ 3307. As relevant here, the MANMED lays out the physical qualification standards for diving duty and identifies the types of medical conditions that would cause a service member to lose his or her diving qualification. *See* AR 630–35 (MANMED, art. 15-102, ¶¶ 1, 7). These conditions include certain psychiatric diseases or conditions, such as any Axis one or two DSM IV diagnosis, an alcohol abuse diagnosis, or an alcohol incident. AR 633–34 (MANMED, art. 15-102, ¶¶ 7(k)–(l)).

According to the MANMED, diving medical examinations are given at regular intervals and are typically conducted by a diving medical officer ("DMO").  AR 631 (MANMED, art. 15-102, ¶¶ 5(a), 6(a)).

Here, the record does not include any diving examination for Mr. Kelly, let alone one finding him physically unqualified for diving duty.  However, the BCNR recognized that the Navy suspended Mr. Kelly's diving privileges in April 2013, following his receipt of a reckless driving citation in March 2013 and nonjudicial punishment ("NJP") stemming from Mr. Kelly's April 2013 arrest for drunken operation of a vehicle.  AR 543.  It also recognized that the Navy removed Mr. Kelly's Second Class Diver Navy Enlisted Classification ("NEC") Code on September 24, 2013, which had the effect of revoking his diving credentials.  AR 544 & n.24.  The removal occurred at the time Mr. Kelly was receiving in-patient alcohol rehabilitation treatment, following his July 2013 arrest for theft, disorderly conduct, and resisting arrest.  AR 544 & n.22; *see* AR 154 (indicating Mr. Kelly was on temporary duty/leave at Ft. Belvoir from September 13 through December 13, 2013); AR 67 (indicating that Mr. Kelly completed the Residential Treatment Center and Co-Occurring Partial Hospital Program between August and December 2013).  The Board concluded that the Navy's suspension and then removal of Mr. Kelly's diving qualification apparently resulted from Mr. Kelly's misconduct, not from a determination that he had a physical or medical condition that affected his fitness for diving.  AR 567, 569.

This conclusion is supported by the record evidence.  The suspension and removal both followed close in time to incidents of misconduct, the former coming after Mr. Kelly's charges of reckless driving and drunk driving and the latter occurring after his charges of theft and resisting arrest.  AR 543, 544.  Indeed, an internal Navy email dated July 26, 2013, confirms that Mr. Kelly was then "on a suspend bust from the former Commandant this spring," after which the Navy

"suspended his diving qual[ification]s as he was having other personal issues as well (family separation, speeding ticket in government van, etc.)." AR 435. Likewise, the record shows that in August 2013 the Navy, shortly before removing his NEC, vacated the suspension of Mr. Kelly's NJP related to his April 2013 arrest because the Navy found that Mr. Kelly had violated the conditions of the suspension. AR 433. That NJP had included a reduction in rate to E-4 (ND3). AR 157, 433. The performance evaluation conducted as a result of Mr. Kelly's separation for misconduct specifically documents the removal of his Second Class Diver NEC. AR 155. As the Board correctly noted, NEC code removal is governed by the procedures in Navy Military Personnel Manual ("MILPERSMAN") article 1221-021, not the MANMED. *See* AR 569. Thus, there is no reason to believe the removal resulted from Mr. Kelly's physical and medical status.

Mr. Kelly argues that the alcohol-related incidents were a byproduct of his mental health issues, *see* ECF No. 34-1 at 39, and that his "major depressive disorder, cognitive impairments, and brain cyst all appear on their face to be disqualifying under the MANMED," ECF No. 38 at 30. Since the MANMED purportedly prohibited Mr. Kelly from diving, in his view, he was unfit to be a diver. *Id.* The Board disagreed with Mr. Kelly's application of the MANMED standards, stating that the MANMED sets forth "regulatory restrictions . . . not physical disabilities." AR 541. As a matter of law, the Board is correct. A finding that a diver has a disqualifying condition under the MANMED does not necessarily establish that such diver is unfit for purposes of a disability determination. The latter standard is solely governed by SECNAVINST 1850.4E. Thus, while a diver's disqualification under the MANMED may prohibit him from diving, and thus is relevant to assessing his fitness, such finding is not in itself determinative of the disability

30

question.[8]  *See Kelly I*, 157 Fed. Cl. at 128–29 (citing SECNAVINST 1850.4E, encl. (3), ¶ 3304).

Moreover, the MANMED does not treat the mere diagnosis of a disqualifying condition as

dispositive of a service member's physical qualification to dive.  *See, e.g.*, AR 630 (MANMED,

art. 15-102, ¶ (3)) (providing for a waiver process), 634 (MANMED, art. 15-102, ¶¶ 7(k)(1), (2))

(contemplating that psychiatric diagnoses, diagnosis of alcohol abuse, or an alcohol incident may

warrant only temporary disqualification).  Accordingly, based on the evidence before the Board,

Mr. Kelly has not shown that the BCNR failed to properly apply the MANMED.

Contrary to Mr. Kelly's argument (ECF No. 34-1 at 35–36), the Board likewise did not

abuse its discretion by declining to seek an advisory opinion from a Navy DMO with experience

applying the MANMED.  The Board explained that if Mr. Kelly had been processed through the

DES, "the PEB would not necessarily have consulted a DMO to reach its fitness determination."

AR 540.  Instead, if medical advice were necessary, the PEB would have consulted the Medical

Corps Officer assigned as a voting member of the PEB or possibly sought an advisory opinion of

the Navy Council of Review Boards' Senior Medical Advisor ("CORB SMA"), as the BCNR did

in this case.  *Id.* (explaining that the PEB is a sub-agency of the CORB).  Although the Board

explained that it was required by law to seek the advice of a psychiatrist, psychologist, or social

---

[8] The BCNR stated that it "found no relevance to the diving standards of MANMED Article 15-102 in the fitness analysis."  AR 569.  That does not seem entirely accurate, given that the Board properly considered the suspension of Mr. Kelly's diving privileges, which it assumed resulted from the Navy's application of the MANMED.  As the Court previously held, the "MANMED identifies the types of medical conditions that would cause a service member to lose his or her diving qualification and is therefore relevant to the special-qualifications inquiry mandated by SECNAVINST 1850.4E."  *Kelly I*, 157 Fed. Cl. at 128 (citation omitted); *see also id.* at 130 (declining to address in the first instance "[w]hether and how [the special qualification consideration[] would have affected Plaintiff's fitness determination").  The Court thus interprets the Board's comment as reiterating its point that a disqualifying condition under the MANMED does not equate to an unfit finding under SECNAVINST 1850.4E.  While perhaps unartfully worded, the Court finds no error in the Board's assessment of Mr. Kelly's MANMED argument.

worker such as the SMA, given Mr. Kelly's allegations of PTSD and TBI (AR 541), Mr. Kelly does not cite any law or regulation suggesting that the Board must or should seek out a medical advisory opinion, much less one from a DMO specifically, upon the applicant's request. On the contrary, the relevant regulations put the burden on the applicant to provide sufficient information supporting his or her entitlement to a record correction. *See* 32 C.F.R. § 723.2(b) ("The Board is not an investigative body."); *id.* § 723.3(e)(2) (explaining applicants' burden). Especially given its reasonable conclusion about the applicability of the MANMED, the Board did not err by declining to seek the requested advisory opinion.

Finally, the Board concluded that none of the remaining criteria of SECNAVINST 1850.4E, encl. (3), ¶ 3304—*i.e.*, Physical Readiness/Fitness Tests and Deployability—supported an unfitness finding. *See* AR 569–70. Mr. Kelly challenges only the finding with respect to deployability. Specifically, he argues that the Board failed to credit proof of his non-deployability as demonstrated by medical records showing he had a chronic medical condition that required ongoing and persistent treatment. *See* ECF No. 34-1 at 37. The Court is not convinced.

The Board reasonably found that there was "no evidence that [Mr. Kelly's] medical conditions rendered [him] undeployable." AR 570. For purposes of a disability evaluation, the deployability factor set forth in SECNAVINST 1850.4E adopts the definition of "deployable" in enclosure 2 of the same instruction. *See* SECNAVINST 1850.4E, encl. (3), ¶ 3304.a.(3); *see also id.*, encl. (2), ¶ 2019 (defining "Deployable"). Per that definition, a service member is "deployable" if "[a] determination [is made] that the member is free of a medical condition(s) that prevents positioning the member individually or as part of a unit, with or without prior notification, to a location outside the Continental United States for an unspecified period of time." *Id.*, encl. (2), ¶ 2019. It would stand to reason that, conversely, non-deployability is a determination that

the service member is *not* free from a disqualifying medical condition(s).  The definition expressly states that "[n]on-deployability does not necessarily equate to Unfitness."  *Id.*  As Mr. Kelly acknowledges, the relevant instruction regarding medical conditions potentially affecting deployability is DoDI 6490.07.  *See* ECF No. 34-1 at 37.  The Board correctly noted that, under such instruction, provisional deployability determinations must be made by "[a] trained DoD health-care provider" and documented "on DD Form 2795."  AR 570 (alteration in original) (quoting DoDI 6490.07, encl. (2), ¶ 2).  It also found that the record contained no such determination with respect to Mr. Kelly.  *See id.*  Mr. Kelly does not contend otherwise.

Instead, Mr. Kelly argues that he showed non-deployability through medical records that demonstrate he was diagnosed with "recurrent severe major depressive disorder" and "neurocognitive issues [that] required ongoing and persistent treatment."  ECF No. 34-1 at 37.  DoDI 6490.07 provides a non-exclusive list of medical conditions that usually preclude deployment, which include chronic medical conditions that require frequent clinical visits or fail to respond to conservative treatment as well as mental health disorders.  *See* DoDI 6490.07, encl. (3), ¶¶ b.(1), h.  While the BCNR recognized that Mr. Kelly's mental health diagnoses "may have met the[] criteria to be potentially non-deployable," it held that Mr. Kelly did not sufficiently prove that they did make him non-deployable.  AR 570.  That conclusion was rational in light of the Board's review and analysis of Mr. Kelly's medical conditions vis-à-vis his ability to perform his common military tasks.  *See id.*

Moreover, Mr. Kelly's contention that his diagnoses alone are sufficient is contrary to the deployability determination standards.  Enclosure 3 of DoDI 6490.07 lays out conditions that "[i]n general" preclude deployment.  DoDI 6490.07, encl. (3), at 10.  The instruction, however, directs that the DoD health-care provider evaluating deployability consider a range of factors in "deciding

whether an individual with a specific medical condition is deployable." *Id.* It also expressly permits the granting of a waiver. *Id.* (instructing that service member with listed condition(s), based on the medical assessment described in enclosure 2, "shall not deploy unless a waiver is granted"); *see id.*, encl. (2), ¶ 3 (outlining waiver procedures). Accordingly, under the relevant guidance, a mere diagnosis does not compel a determination of non-deployability.

Lastly, Mr. Kelly further alleges that the Board incorrectly concluded that the screening criteria in Enclosure 8 of SECNAVINST 1850.4E, which sets forth procedures to refer cases to the PEB, were inapplicable to the Board's review. *See* ECF No. 34-1 at 40. In its remand decision, the Board stated that it "found no merit to [Mr. Kelly's] novel contention that" Enclosure 8 "compels this Board to refer [his] case to the PEB." AR 560. It further explained that "as a general rule, Service members will be referred to the PEB for a fitness determination 'only by a medical board that has found the member's fitness for continued naval service questionable by reason of physical or mental impairment.'" *Id.* (quoting SECNAVINST 1850.4E, encl. (3), ¶ 3201.a).

Mr. Kelly's principal argument is that "the BCNR's professed incompetence to determine unfitness" means that the Board was required to refer the case to a PEB and that its failure to do so demonstrates that it "[f]ailed to [a]pply" Enclosure 8. ECF No. 34-1 at 40–41. The Government concedes, as it must, that the Board is competent to stand in the shoes of a PEB to make a fitness determination where, as here, "a service member has not been considered or has been rejected for disability retirement prior to leaving active service." *Kelly II*, 69 F.4th at 891 (quoting *LaBonte*, 43 F.4th at 1361 n.4); *see* ECF No. 37 at 44–45. The Court is thus unconvinced by this argument. In any event, at oral argument, counsel withdrew Mr. Kelly's request for relief to remedy the Board's alleged error—*i.e.*, remand with instructions to refer to the PEB. *See* ECF No. 48 at 7:6–8. Accordingly, any claim based on Enclosure 8 is moot.

34

*    *    *

In sum, the Board reasonably determined that there was no error or injustice in Mr. Kelly's discharge without military disability retirement.  To be sure, the Board recognized that Mr. Kelly demonstrated that at the time he separated from the Navy he suffered from certain medical conditions incurred during his service as a diver.  However, Mr. Kelly did not meet his burden to show that these conditions rendered him unable to perform his duties as a Second Class Navy Diver due to physical disability.  In reaching its conclusion, the Board focused on various evidence (or the lack thereof) in the record, not simply Mr. Kelly's performance evaluations, and properly connected its analysis to the question of whether Mr. Kelly could reasonably perform his diving duties.  Accordingly, the Court upholds the Board's decision on the basis of its fitness finding.

### D.    Mr. Kelly Was Not Denied Due Process by Not Receiving a Personal Hearing.

Apart from the substance of its decision, Mr. Kelly further argues that the Board violated his constitutional rights by deciding his application on the papers because "due process required that he be given an opportunity to explain the nuances and detail . . . in a personal hearing."  ECF No. 38 at 23.  He asserts that such hearings "are the rule in government benefit cases," *id.*, consistent with an analysis under *Mathews v. Eldridge*, 424 U.S. 319 (1976), and that the Board erred in holding "that due process hearing requirements do not apply to Board proceedings," ECF No. 34-1 at 17.  The Court finds no error in the Board's decision not to hold a personal hearing in this case.

The Federal Circuit held that Mr. Kelly has a property interest in military disability retirement benefits for purposes of due process, *see Kelly II*, 69 F.4th at 900, but it did not rule on what procedures Mr. Kelly was due in the BCNR proceedings or hold that due process required the Board to grant a hearing in his case.  Moreover, the Supreme Court in *Eldridge* did not hold

that an in-person hearing is always required before an individual is determined to be ineligible for a statutory benefit, such as military disability retirement benefits.  Rather, the Supreme Court acknowledged that under the Due Process Clause of the Fifth Amendment, "[t]he fundamental requirement . . . is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Eldridge*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  Far from announcing a rigid rule, the Court reiterated "the truism" that due process "is not a technical conception with a fixed content unrelated to time, place and circumstances" but rather is "flexible and calls for such procedural protections as the particular situation demands." *Id.* at 334 (citation modified).

Eldridge sets forth a three-part test to determine what process is due in a specific case, looking to (1) the private interest affected by an official action; (2) the risk of erroneous deprivation of such interest via the process used and the probable value, if any, of additional or substitute procedures; and (3) the Government's interest, including fiscal and administrative burdens that the additional or substitute procedures would entail.  *Id.* at 335 (citing *Goldberg v. Kelly*, 397 U.S. 254, 263–71 (1970)).  *Eldridge* recognized that "written submissions" can sometimes be an adequate "substitute for oral presentation" where they "provide an effective means for the recipient to communicate his case to the decisionmaker." *Id.* at 345 (distinguishing *Goldberg*, 397 U.S. at 269).

To assess whether due process was provided to Mr. Kelly with respect to his request for military record correction, the Court begins by looking to the statute that authorizes correction boards and the regulations that govern their proceedings.  Importantly, Mr. Kelly cites no statute or regulation that requires a hearing before the BCNR.  The statutory provision that authorizes the Secretary of a military department, acting through a correction board, to correct military records

based on error or injustice is silent on the issue of personal appearances before the boards. *See* 10 U.S.C. § 1552(a)(3)(A). Instead, it directs the various Secretaries to establish procedures for boards to resolve applications for record correction. *See id.* For the BCNR, those procedures are set forth in 32 C.F.R. § 723.3, which permits a three-member BCNR panel in its discretion to "authorize a hearing, recommend that the records be corrected without a hearing, or to deny the application without a hearing."[9] 32 C.F.R. § 723.3(e)(1).

Consistent with this statutory scheme, case law likewise does not recognize a per-se hearing rule. In *Flute v. United States*, the Court of Claims reviewed a similar procedure used by the Air Force Board for Correction of Military Records ("BCMR"). 210 Ct. Cl. 34, 41 (1976). The regulation at issue there "authorizes the [BCMR] to hold a hearing, order correction of records without a hearing or deny a hearing." *Id.* (citing 32 C.F.R. § 865.7). Noting that a hearing before the BCMR is not required by 10 U.S.C. § 1552 and "is within the BCMR's discretion" to grant or deny by regulation, *Flute* concluded that "[t]he denial of a hearing before the BCMR [did] not per se deprive plaintiff of due process." *Id.* at 40–41. Similarly, in *Callan v. United States*, the Court of Claims reviewed the BCMR's denial of a hearing. 196 Ct. Cl. 392, 401 (1971). *Callan* held that in the absence of a statute or regulation requiring a hearing, the proper inquiry is whether the denial of such a hearing was "arbitrary and unreasonable." *Id.* (collecting cases). Other judges in

---

[9] Notably, there is also no statutory right to a hearing for a service member who, after referral to the DES, is found fit for continued duty. *See* 10 U.S.C. § 1214 (providing a right to a full and fair hearing, if demanded, only to a service member who is found unfit and "retired or separated for physical disability"). SECNAVINST 1850.4E similarly does not provide such right. *See* SECNAVINST 1850.4E, encl. (4), ¶ 4109.a. Rather, it gives the President of the PEB ("PPEB") discretion to grant a Formal PEB hearing to a service member who is "found Fit to continue naval service or Physically Qualified for continued naval service from the review of the Informal PEB." *Id.* ¶ 4109.b (providing that the PPEB may also recommend denial to the Director of the Naval Council of Personnel Boards, who in turn issues a final, unappealable decision to grant or deny a hearing). Moreover, an Informal PEB issues its preliminary findings based only on a record review. *See id.* at encl. (1), ¶ 1004.b (describing Informal PEB procedures).

similar cases have likewise rejected plaintiffs' arguments that a correction board erred by not holding hearings on the plaintiffs' claims for military disability retirement benefits. *See, e.g.*, *Armstrong v. United States*, 205 Ct. Cl. 754, 764 (1974) (noting that the Court of Claims "will not hold the denial of a hearing improper where plaintiff failed to show, based on the documentation supporting the application, that the [correction board] acted arbitrarily in denying the hearing"); *Lyons v. United States*, 18 Cl. Ct. 723, 729 (1989) (affirming denial of hearing where "the controlling statutes and regulations do not guarantee petitioners a hearing before a corrections board" and where plaintiff did not submit evidence that denial was unreasonable).

Here, Mr. Kelly has not shown that the circumstances of his application demanded a personal hearing. The Board's remand decision listed all the evidence it considered in reaching its conclusion, including the materials Mr. Kelly submitted consistent with the Court's remand order. AR 538–39. That submission included a 17-page legal brief prepared by counsel and a 52-page document appendix containing, among other things, Mr. Kelly's personal declaration. *Id.* The Board also reviewed Mr. Kelly's response (prepared by counsel) to the CORB's advisory opinion, as well as the case file from the Board's prior review including Mr. Kelly's original application. AR 539. "The Board determined that [Mr. Kelly's] personal appearance, with or without counsel, would not materially add to their understanding of the issues involved in [his] case." *Id.* It specifically noted that Mr. Kelly's declaration purported to describe what he would testify to if called to appear and found that his credibility was not at issue. *Id.* Accordingly, the Board rationally concluded that a hearing was unnecessary. *Id.*

With respect to the fitness determination, Mr. Kelly does not identify how the Board's written submission procedures deprived him of the opportunity to present material evidence and what, if any, additional value would have been gained if the Board had held a hearing. At most,

he contends that the Board's analysis of the risk-to-others factor in SECNAVINST 1850.4E, encl.

(3), ¶ 3302.b.(1) was "probably an issue on which a personal hearing may [have been] essential"

because "the only person who can explain to the Board how Kelly's impairments might endanger

other divers is Kelly himself."[10]   ECF No. 38 at 31.   Mr. Kelly does not explain why such

assessment could not properly be based on the documentary evidence before the Board, but even

assuming it could not, Mr. Kelly had the opportunity to provide that explanation in the declaration

he submitted to the Board.   That he did not take advantage of the opportunity in an effort to meet

his burden of proof does not mean that the Board deprived him of due process.

E.    **The FOIA Request, Response, and Counsel Emails Are Not Necessary to Permit Meaningful Judicial Review.**

Finally, Mr. Kelly argues that his FOIA request to the Board and the Board's response, as

well as an email between his counsel and Government counsel, show the lack of involvement of

the BCNR members who decided his case in drafting and approving the remand decision.   *See*

ECF No. 50 at 1.   He argues, for the first time, that the remand decision does not represent the

factual findings and reasoning of the panel members, and as such the Court must perform a de

novo review.   *See id.* at 2; *see also id.* at 3 (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*,

401 U.S. 402, 423 (1971); *Camp*, 411 U.S. at 142).   The Government rejects Mr. Kelly's motion

as untimely and meritless.   ECF No. 51 at 1.   It contends that the Court should not allow Mr. Kelly

to raise new arguments more than five months after briefing concluded, *see id.* at 2–4; that none

of the documents Mr. Kelly seeks to add are necessary for effective judicial review, *see id.* at 4;

and that de novo review is inappropriate because the BCNR's fact-finding process is not defective,

---

[10] As explained above, the Board was not required to consider that factor.   *See supra*
§ III.A.2.

*see id.* at 5–7. The Court agrees that the documents are not necessary for meaningful review and that Mr. Kelly's request is untimely.

First, the FOIA request and response, as well as the communications between counsel, are not necessary "to permit meaningful review consistent with the APA." *Axiom*, 564 F.3d at 1381. These documents were obviously not considered by the Board in resolving Mr. Kelly's application because they pertain to the ancillary issue of whether the Court should apply de novo review under one of the APA's "standards of limited applicability." *Volpe*, 401 U.S. at 414 (discussing 5 U.S.C. § 706(2)(F)); *see Hatmaker v. United States*, 136 Fed. Cl. 454, 460 (2018) ("The court . . . reviews the [Board's] decision in light of the evidence that was before the board . . . .").

Nor are the documents necessary to review any claim raised by Mr. Kelly in this case because Mr. Kelly's Complaint, original dispositive briefing, and renewed dispositive briefing do not include such an argument. Indeed, the first time Mr. Kelly broached the issue of whether panel members in general contribute to or approve the BCNR's written decisions was in a "Notice" filed after briefing concluded and then again at oral argument. *See* ECF No. 46; *see also* ECF No. 48 at 6:11–7:4. He did so without presenting any meaningful legal argument or citation to authority to support his discussion of the issue, and at the oral argument his counsel suggested that the Court create a factual record on the spot by questioning the Government's counsel about the BCNR's procedures. *See* ECF No. 48 at 6:11–7:4 ("I'm going to close with really a question -- because I really wasn't intending to present it to this Court -- . . . what, exactly is the decisional document that the Government or the board is presenting to you? . . . [A]nd, again, I don't have a record on this; it's depending on whether or not Your Honor wishes to pursue it with the Government[.]"); *see also id.* at 35:3–37:1. At the time, Mr. Kelly did not have a response to his FOIA request. *See id.* at 35:12–14. After the Court rejected the invitation to expand the record on its own and

reminded Mr. Kelly that the time had passed to request the Court's consideration of extra-record information, Mr. Kelly's counsel appeared to withdraw the issue. *See id.* at 67:4–9 ("So I can't convince the [Court] to ask the Government whether or not the decision is authentic, can I? Well, if the Court's not going to ask that, then I have no evidence that the . . . decision is not authentic and I'm not asking you to decide that."); *see also id.* at 67:21–24, 78:20–79:1. Nevertheless, several weeks later Mr. Kelly filed his Motion to Supplement.

The Court, however, is not required to entertain untimely arguments not raised in a party's initial brief, and indeed not raised until after both the close of briefing and oral argument. *See supra* § III.A.2; *Washington Fed. v. United States*, 149 Fed. Cl. 281, 294 n.13 (2020) ("Any new arguments raised in plaintiffs' supplemental brief are untimely and waived." (citations omitted)); *CliniComp Int'l, Inc. v. United States*, 134 Fed. Cl. 736, 753–54 (2017) (denying request to file supplemental briefs after oral argument); *Murakami v. United States*, 58 Fed. Cl. 347, 351 n.3 (2003) (refusing to consider a declaration submitted with a reply), *aff'd*, 398 F.3d 1342, 1355 (Fed. Cir. 2005). And Mr. Kelly provides no reason why the Court should permit him to introduce extra-record evidence at this late stage on an issue the parties never fully briefed or argued.

Providing any sufficient justification would be difficult, given that Mr. Kelly had ample notice of the issue and opportunity to develop and timely present this new argument. As Mr. Kelly's counsel explained, the issue of whether panel members draft or approve the written decision is not specific to Mr. Kelly's case; in fact, Mr. Kelly's counsel stated at the oral argument that he was pursuing the issue in two other cases. *See* ECF No. 48 at 6:13–15, 35:10–12, 35:21–25. Even if notice were limited to this case, the Government filed the BCNR's remand decision on May 29, 2024, *see* ECF No. 28, signed by the BCNR's Executive Director on May 28, 2024, *id.* at 34, which stated that the three-member panel met in executive session on April 26, 2024, to

consider his application de novo.  *Id.* at 1; *see also* AR 538.  The decision does not indicate whether the panel members contributed to or approved the written decision.[11]  Mr. Kelly's renewed motion for judgment on the administrative record was not due until September 10, 2024.  ECF No. 30 at 1.  Yet, he waited until April 22, 2025, to submit his FOIA request (ECF No. 50-1 at 1), many months after the parties completed briefing and just a few days after the Court scheduled oral argument on the parties' dispositive motions.  *See* Scheduling Order, ECF No. 45.

Accordingly, Mr. Kelly has not met his burden to justify supplementation of the Administrative Record.

### IV.  CONCLUSION

For these reasons, the Court **GRANTS** the Government's Cross-Motion for Judgment on the Administrative Record (ECF No. 37), **DENIES** Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 34), and **DENIES** Plaintiff's Motion to Supplement the Record (ECF No. 50).  The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**

Dated: October 20, 2025                    */s/ Kathryn C. Davis*_____
                                           KATHRYN C. DAVIS
                                           Judge

---

[11] It should also be noted that Mr. Kelly's original BCNR decision issued in February 2018 provided substantially similar information—*i.e.*, it was signed by the BCNR's Executive Director, stated that a three-member panel met in executive session on a prior date to consider Mr. Kelly's application, and did not indicate what, if any, involvement the panel members had with the written decision.  *See* AR 5–7.  Mr. Kelly did not raise any claim with respect to this process in the Complaint filed in May 2020, ECF No. 1, or his original motion for judgment on the administrative record filed in September 2020, ECF No. 10.